**AMERICAN SAFETY RAZOR CORPORATION v. INTERNATIONAL SAFETY RAZOR CORPORATION et al.**

District Court, D. New Jersey. April 23, 1928.

**1. Trade-marks and trade-names and unfair competition ⬅67—Concern is entitled to benefit of its legitimately acquired trade-names in vending products.**

A business concern is entitled to the benefit of its legitimately acquired trade-names in vending its products.

**2. Trade-marks and trade-names and unfair competition ⬅70(2, 3)—Deceptive appropriation or use by one concern of another's trade-names or marks is prohibited.**

The public is not to be misled in its purchases through any deceptive or adroit appropriation or use by one concern of another's trade-names or marks in furthering the sales of its own products.

**3. Trade-marks and trade-names and unfair competition ⬅68(3)—Manufacturer may advertise fact that repair or renewal parts made by him will fit general commodity, which is product of various manufacturers, made up of several parts.**

Where a general commodity, which is product of various manufacturers, is made up of several parts, one or more of which must of necessity be renewed or repaired from time to time, and there is a standarization as to size existent among various manufacturers, it is lawful for one manufacturer to call attention to fact that repair or renewal parts as made by him will fit into commodity which is manufactured by another.

**4. Trade-marks and trade-names and unfair competition ⬅68(2)—Manufacturer, setting forth truth, is not liable for results of purchaser's failure to exercise ordinary care, as respects unfair competition.**

As respects unfair competition, public is expected to pay ordinary attention to the facts in the matter of its purchases, and, if such ordinary attention apprises purchaser of truth, manufacturer, setting forth truth, is not responsible for results of purchaser's failure to exercise ordinary care.

**5. Trade-marks and trade-names and unfair competition ⬅70(3)—Statement on razor blade cartons that blades will fit Gem, Ever-Ready, and other razors held not calculated to induce belief that blades are Gem or Ever-Ready blades.**

Cartons containing razor blades, stating that blades "will fit Sha-ve-zee, Gem, Liberty, Ever-Ready & other razors," held not calculated to deceive or mislead a purchaser into believing that carton contains either Gem, Ever-Ready, or Star razor blades.

**6. Trade-marks and trade-names and unfair competition ⬅85(1)—Complainant, seeking to enjoin alleged trade-mark infringement and unfair competition, held not entitled to relief, in view of its deceptive advertising methods.**

Complainant, seeking to enjoin alleged infringement of trade-marks "Gem," "Ever-Ready," and "Star" safety razors and blades, and alleged unfair competition, held not entitled to seek relief in court of equity, in view of fact that, notwithstanding complainant manufactures all three blades, using identical material, it advertises and sells them at different prices, and as though the different articles were made in competition with each other, thus showing lack of good faith toward public.

In Equity. Suit for permanent injunction by the American Safety Razor Corporation against the International Safety Razor Corporation and another. Complaint dismissed.

Milton Dammann, of New York City (Maurice R. Roche, of New York City, Insley, Vreeland & Decker, of Jersey City, N. J., and Minturn De S. Verdi and Harry D. Nims, both of New York City, of counsel), for complainant.

Davies, Auerbach & Cornell, of New York City (Martin A. Schenck and Julian C. Harrison, both of New York City, of counsel), for defendants.

RUNYON, District Judge. The complainant herein seeks a permanent injunction restraining the defendants from alleged trademark infringement and unfair trade practices, through the use of the trade-names "Gem," "Ever-Ready," and "Star," in connection with the manufacture, sale, and display of defendant's safety razor blades, together with an accounting for profits, damages, and costs.

The complainant herein is a corporation organized under the laws of Virginia on July 17, 1919, and is engaged in the business of manufacturing and selling safety razors and safety razor blades in extraordinary volume, the annual sales of razor blades alone aggregating more than 100,000,000. At the time of its organization it acquired through purchase and consolidation the business of three of the largest safety razor companies in the United States, viz. that of the Gem Safety Razor Corporation, manufacturers of the "Gem" safety razor and blade, of the American Safety Razor Company, Inc., manufacturers of the "Ever-Ready" safety razor and blade, and of the Star Safety Razor Corporation, manufacturers of the "Star" safety razor and blade. At the time of the purchase and consolidation these three companies had been in business for long periods, and were, through the extensive advertising of their wares and trade-names, as well as by reason of the quality of their merchandise, exceptionally well known.

The complainant states that $4,000,000 in cash was paid for the assets of the Gem Safety Razor Corporation, of which sum $3,600,000 represented the value of the trade-name "Gem"; further, that the equivalent of $4,350,000 was paid to the American Safety Razor Company, Inc., for the trade-name "Ever-Ready"; and that, of the sum of $278,-000 paid for the assets of the Star Safety Razor Corporation, all but $28,000 thereof represented the value of the trade-name "Star." In addition to these sums, the complainant during the first six years of its corporate existence expended upwards of $4,-000,000 in advertising its safety razor frames and blades under the three trade-names above noted, the "Ever-Ready" and "Gem" brands being the more prominently featured in the advertisements.

In fact, in all its forms of advertisement the complainant stresses the three trade-names above mentioned, for the use of which it had paid something like $8,000,000, and in rare instances only mentions the fact that it is the manufacturer and seller. This procedure is thus described in complainant's brief:

"These trade-names have been continually featured by the complainant and its predecessors for one-third of a century or more on all packages, wrappers, cartons and advertising matter, and except in isolated instances, the complainant does not mention the fact that 'Gem' or 'Ever-Ready' or 'Star' razors or blades are manufactured or sold by the complainant. The purchasing public, therefore, does not know the name of the manufacturer of these razors and blades. The complainant in its advertising and literature lays no stress upon its own corporate name. It lays all stress upon its several trade names and brands. The purchasing public, therefore, buys complainant's merchandise because the safety razors and blades manufactured under these several trade brands have been long and favorably known to the purchasing public."

The defendants are likewise engaged in the manufacture and sale of safety razor frames and blades, their various trade-names being "Sha-ve-zee," "Liberty," "Mirak," and "Bryford." Of these four brands, their principal reliance is upon the two first named, "Sha-ve-zee" and "Liberty."

While the safety razor in its entirety consists of a combination of frame and blade, and one member without the other is useless, the principal part of the business consists in the manufacture and vending of blades. This activity has attained almost unbelievable proportions, and the profit resulting therefrom in the complainant's case is sufficient to enable it to sell its razor frames at an actual loss.

The blades used in all the various makes of razor which are concerned in the present suit are the so-called single blades, having a shaving edge on one side of the blade only, as distinguished from a Gillette blade, for instance, which is designed with a shaving edge on each of its two sides. These single blades have been, to all intents and purposes, standardized as to size, and consequently are interchangeable, in the sense that any one of the various blades may be used upon any one of the various frames. This enables the owner of a single blade razor frame to use any make of single razor blade which may best suit

him, irrespective of its origin, a practice which has attained large proportions in these days of home shaving.

In connection with the ever-increasing volume of the safety razor industry, there has come into being among certain manufacturers a practice somewhat akin to that which obtains at times in other lines of trade, where standardized parts may be used interchangeably in connection with competing products, viz. publication of the fact that the advertiser's blade will fit a competitor's razor frame. It is indulgence in this practice which has brought the present suit into being; the complainant claiming that the methods of publication adopted by the defendants in appropriating the various trade names are not only calculated to, but actually do, deceive the purchasing public, and lead it to believe that, in buying a carton of defendants' product, it is in reality purchasing complainant's blades.

In one form or another this question has already been the subject of controversy, both in the Southern district of New York and in this district, where applications for preliminary injunctions were made by the complainant. In the Southern district of New York, Judge Learned Hand, to whom application had been made by complainant, looking to a restraint against F. W. Woolworth Company for selling cartons of defendants' product which mentioned complainant's blades in the matter printed thereon, made an injunction order forbidding defendants' use of complainant's trade-names as theretofore maintained, but permitting limited use thereof in a form specified and approved by him.

The complainant claims that the modification authorized and sanctioned by Judge Hand falls far short of the relief to which it is entitled, and contends that the defendants should be altogether forbidden to use complainant's trade-names in connection with their own printed matter, or at least be compelled to make specific disavowal in such printed matter of any connection with the manufacture of complainant's blades.

Both sides to this controversy have, properly enough, emphasized the fact that the public is entitled to be protected in its purchases of various commodities. This protection, while assuming many forms, may be said to have as its general aim and purpose the keeping of faith with the public, to the end that representations made to it concerning commodities which it is asked to buy shall not be deceptive in any way, or be calculated to mislead the general purchaser regarding the true facts, especially where any representation actually made or failure to make proper disclosure affects harmfully a buying public in such important matters as those which have to do with the identity of the commodity and the price demanded therefor.

The complainant herein claims itself the victim of a serious wrong on the part of the defendants, in that the wording on the defendants' cartons of razor blades and vending cards appears in phrasing of such character and relative conspicuity as to lead to confusion in a purchaser's mind, and create therein the impression that the defendants' products are those of the complainant, and therefore asks, as already noted, that the defendant be forbidden to use any of the complainant's trade-names in connection with its advertising matter, or at least be compelled to state in such advertising matter that it does not manufacture the complainant's products.

[1, 2] That a business concern is entitled to the benefit of its legitimately acquired trade-names in vending its products must be universally conceded, as also the further proposition that the public is not to be misled in its purchases through any deceptive or adroit appropriation or use by one concern of another's trade-names or marks in furthering the sales of its own products. But, in connection with these assumptions, there are two other propositions which are of equal importance in the consideration of a dispute like the present one:

[3] First, that where a general commodity, which is the product of various manufacturers, is made up of several parts, one or more of which must of necessity be renewed or repaired from time to time, and there is a standardization as to size existent among the various manufacturers, it is lawful for one manufacturer to call attention to the fact that the repair or renewal parts as made by him will fit into the commodity which is manufactured by another. As supporting this proposition, counsel for the complainant spoke as follows in his argument:

"Of course, a man who makes repair parts has got a right to say that they will fit this mowing machine or that reaper or this razor; there is no doubt about that; it is common sense; we see it on every hand every day. That is one statement, that is one proposition clear indeed; but it is also perfectly clear, on the other hand, that the courts, in construing markings of that kind, have held that there is no right to do that inherent in anybody, and if a man chooses to do that sort of thing he must do it in such a way that he doesn't use anybody else's trade-mark as a trade-mark and that he doesn't do anything

which will confuse the public and make them think that his repair parts are made by the manufacturer of the machine into which his parts are to fit."

And in addition thereto the following may be cited as illustrative of the same principle:

"I am clearly of opinion that the defendants and other manufacturers may sell ink and paper for use on the 'Neostyle' machine and to do it they must say so, but, of course, they must not by words or get-up represent their goods as the plaintiff's goods." Neostyle Mfg. Co. v. Ellam's Duplicator Co., 21 Rep. Patent Cases, 185 (High Court of Justice, Chancery Division), at page 193.

*"The system of so defining the place, size, and shape of a part of a machine is not original with appellants. It is common to many other manufacturers. The purpose is to facilitate replacements. If they may also be appropriated as trade-marks, it will operate to practically monopolize all repairs and replacements by the original maker of the machines.* The question is, therefore, one of wide general interest. If complainant's contention is well founded, it will injure the public by stifling competition in the manufacture and sale of such repairs and replacements by confining their production to the original producer. The necessity for a common designation for such parts of such machines, by whomsoever the part is made, is most apparent, upon the showing made by the appellant.

"Neither does the evidence justify any relief upon the ground of unfair trade. The appellees have affixed to the parts made by them for use in Deering machines the same letters and numerals as those affixed upon the same parts by the Deering Company. This they have a right to do. These parts are open to the manufacture of all. The letters and numerals affixed, being only for the purpose of defining kind, shape, size, and place, may be rightly used by any one for the same purpose. These parts made by appellees have been plainly advertised by catalogue and label as of their own manufacture, and their whole course of dealing, as shown by this evidence, has been such as to mislead no one into buying their product as that of appellants." Deering Harvester Co. v. Whitman & Barnes Mfg. Co. (C. C. A.) 91 F. 376, at page 380.

"The defendant had the legal right to manufacture and sell parts of stoves suitable to replace worn-out parts of the stoves made by the plaintiff. He violated no right of the plaintiff by using parts made by it as patterns for casting like parts. * * * The names used by the defendant in his catalogue are equally apt, whether he intended to deceive as to the origin of the goods sold by him, or merely to indicate the well-known classes of stoves which his grates, beds and other parts would fit; but as he has carefully stated, in the same catalogue, that he is the manufacturer, the fair conclusion is that he had no purpose to mislead, but used the names of the stoves as he did, to express the idea in a concise form, which would have been conveyed more unequivocally perhaps if he had said, 'grates to fit Chelsea Cook, Nos. 7 and 8,' instead of saying, as he did, 'Chelsea Cook grates, No. 7 and 8;' and such clearly must have been the understanding of all who read his catalogue." Magee Furnace Co. v. Le Barron, 127 Mass. 115, at pages 120 and 122.

[4] Second, that the public is expected to pay ordinary attention to the facts in the matter of its purchases, and, if such ordinary attention would apprise a purchaser of the truth, a manufacturer who has set forth the truth is not to be held responsible for the results of a purchaser's failure to exercise such care as above indicated.

"A court of equity will not interfere where ordinary attention by the purchaser of the article would enable him at once to discriminate one from the other. McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828. And where, as here, the name is sufficiently distinctive to avoid that misconception of the article of clothing, there can be no unfair competition." Wornova Mfg. Co. v. McCawley & Co. (C. C. A. ) 11 F.(2d) page 465 at page 466.

As heretofore stated, the matter in controversy here has, in some of its phases, already been before another court, and the following is a brief recital of the facts:

In the Southern district of New York, the complainant brought suit against the F. W. Woolworth Company to restrain the sale of defendants' product by the Woolworth Corporation; the contention being, in effect, that the nature of defendants' advertising matter in lettering and wording, as set forth upon its cartons and other publicity mediums, was such as to confuse the public and menace the good will and value of complainant's business. [5] Upon the argument for injunction, there was submitted to Judge Learned Hand, for his information and consideration, certain cartons and advertising placards which the defendants herein had in preparation. Judge Hand approved the form and content of these cartons and advertising placards, and his injunction order carried such approval. The defendants for the past five or six years have apparently continued without variation these

approved forms, and announce their intention of further continuance thereof, even though they be successful in securing a dismissal of the present application put forth by complainant.

An examination of the carton approved by Judge Hand discloses a small cardboard casing, basically red in coloring, with dark blue ornamental panel designs and lettered in white. This casing is something more than 1¾ inches long, an inch wide and one-quarter of an inch in depth.

One of the broad sides is completely filled with the picture of an ornamented razor blade, on which is inscribed the hyphenated word "Sha-ve-zee," and in microscopic type the words "Trade-mark Reg. U. S. Pat. Off." Each of the narrow sides also bears nothing but the same hyphenated word, with trademark references, while on one end are set forth the words "3 blades," and on the other end "Made in U. S. A." On the second of the two broad sides are set forth the following words:

> "Will Fit
> Sha-Ve-Zee
> Gem, Liberty
> Ever-Ready
> & other razors."

All of these words, with the exception of the last three, are printed in letters of practically identical size and easily distinguishable at the distance of a man's arm. The words "& other razors" are in much smaller type. The advertising placard is equally unequivocal.

Viewing these cartons and placards impartially, as I believe I have been able to do, I am unable to discover any feature or element therein which is calculated in the slightest degree to deceive or mislead a purchaser into the belief that it contains the complainant's products. In fact, it would appear to me that any mental process which could arrive at an erroneous conclusion as to identity of product after inspecting this carton or placard is either wofully slipshod in its workings or merits the charge of inherent incompetence.

I realize fully that in some of the antecedent advertising of defendants there appear patent efforts to give prominence to the complainant's products by name, and to minimize reference to their own, and that the charge of unfair competition under such circumstances alone would have had much to support it. But, even so, the fact that the defendants have for years discontinued such practices and are now proceeding upon a policy which appears to have the sanction of trade usage in general, and lies within the scope of that which has been pronounced fair by many judicial tribunals, establishes a situation which in theory, as well as practice, is fair to both sides.

[6] There is another feature to this litigation, however, which to my mind goes to the heart of the entire controversy, and, while it was given no place in the original pleadings, yet appeared later through the medium of affidavits, and loomed so large upon final argument as to compel more than perfunctory reference thereto at this time, and that is the matter of complainant's policy in its own advertising.

It will be remembered that complainant is the owner of the Gem, the Ever-Ready, and the Star safety razor industries, having paid millions of dollars therefor, and that in hardly any cases does it advertise itself as the owner of these various industries, preferring that the different concerns should continue a semblance of the same corporate independence, in the advertising programs which are designed for their exploitation, as obtained in fact before their purchase by complainant. And in so doing complainant would seem to be entirely within its rights. The public as a general rule is much more interested in the trade-name of a commodity than it is in the manufacturing ownership thereof, and gives far more serious thought to that which it can procure for its money than to the pocket into which that money will eventually go.

Consequently the fact that the public may have been entirely ignorant of the new and combined ownership of the former business rivals does not of itself work to that public's disadvantage in any way. Equally true is it that complainant, having paid huge sums for the corporate business, good will, trade-names, etc., of the various concerns, is entitled to every legitimate benefit which ownership thereof may confer. These legitimate benefits, whether they be few or many, must nevertheless hold one indispensable characteristic in common, and that is the maintenance of good faith with the public; for, if the public be denied its right to fair treatment, by the same token the benefit to the corporation ceases to be legitimate.

As may well be imagined, the complainant has put out an immense volume of advertising, more especially in the exploitation of its Gem and Ever-Ready razor blades. This advertising bears every earmark of intense business rivalry, and one could never guess from perusal of these public announcements that the competition between them was any

less keen than their own boasted razor edges, concerning the virtues of which the field of fitting superlatives has been drawn upon almost to the point of extinction.

The object of this advertising is, of course, to further the sale of razor blades, and to build up a larger and more enthusiastic constituency for each blade through the proclamation of virtues possessed by it to the exclusion of every other blade in the world. In other words, the public is besought to believe that the Ever-Ready blade is the best, and is asked to pay the Ever-Ready price therefor. In like manner it is asked to pin its faith to the Gem blade as a ne plus ultra proposition, and to pay the regulation Gem price. The Star blades are likewise for sale at their own appointed price.

With the foregoing in mind, the following testimony, adduced before me, is of more than ordinary interest. It was given on cross-examination by Mr. Elflam, a former employé of the Gem Safety Razor Corporation, and later, and for five years, superintendent of complainant's blade department, and is as follows:

"Q. I think Mr. Dammann stated that all of these different brands of razor were made in the same way; that is, the Gem and the Star, and the Ever-Ready. Do you superintend the manufacture of all of them? A. I do.

"Q. You do? A. Yes.

"Q. All made in the same factory? A. Same factory.

"Q. And in the same way? A. Primarily in the same way.

"Q. Yes; that is, they are in reality the same blade, are they not? A. They are.

"Q. And have been ever since you have been in the employ of the American Safety Razor Company? A. Yes."

Bearing in mind that complainant's own superintendent says that the same blade serves the three concerns, there appears to me to be a sad lack of good faith toward the public in the following excerpts from complainant's advertising, which have been drawn from numerous sources by defendants' counsel and submitted for consideration:

The Gem is variously exploited in these selections as follows:

"Each is equipped with blades of the *keenest cutting edge* known to science."

"Gem Double Life Blades retail 7 for 50c."

"The blade is the razor. The steel in these blades * * * this steel is *unique in Razordom*."

"Gem Damaskeene blades are tempered by a *special process* of our own. *Manufactured* by the Gem Safety Razor Corporation."

26 F.(2d)—8

"Tempered by the Gem process."

"Gem users will tell you that Gem Damaskeene blades do have a *more delicate edge;* do *last longer;* do give smoother faces. Gem Safety Razor Corporation."

"It is a *specially tempered Gem* (patented) process that gives each Gem blade a remarkably enduring keenness."

"Tempered singly by the Gem special process. * * * Gem Damaskeene blades *have the most practical cutting edge made.*"

"Gem Damaskeene blades are *Best.*"

"Gem Damaskeene Blades demonstrated to the world that these wafer blades *excelled all shaving blades* for guaranteed uniformity and intense keenness."

"The Gem Double Life blades possess the keenest edge ever developed. Gem Safety Razor Corporation."

"Gem Double Life Blade shaves twice as clean—stays twice as keen—as any other blade. Gem Safety Razor Corporation, *Factories,* Brooklyn, N. Y."

"Gem metallurgists have found that high power electrical heat treatment aligns the molecules of steel and permits grinding the steel to a perfect shaving edge, one-thousandth of an inch thin. The result is a new degree of keenness which you must experience to appreciate."

"Are your whiskers in trouble? Does it hurt your skin when you give yourself a close shave? If so, *change to Gem Double Life blades.* They are electrically heat-treated by a new method that seems to alter the very structure of the steel. Gem Safety Razor Corporation, *Factories,* Brooklyn."

"*No blade in the world* can give such marvelous shaves as Gem or retain its edge through so many shaves. These are not claims they are facts."

"A famous scientist who was with Thomas Edison for 20 years performed the greatest accomplishment of his career by attaining perfection in the new Gem Double Life blades—blades so perfect that each and every one of them will give you more and better shaves than any other make of blade."

"Most razor makers improve their boxes occasionally—but *only Gem* has improved the most important thing of all—the blade. *Throw away those old hack saw razor blades* that punish your face mornings. Gem Double Life blades have the keenest edges known to science."

"That terrible shaving tool the Army gave us—toss it out with all your other old chin scrapers and get Gem blades. * * * Softest, smoothest shaves in the world."

While the Ever-Ready's good points are set forth in part in this manner:

"The most highly refined shaving implement you ever saw." "Ever-Ready Radio blades possess the *keenest cutting* edge known to the science of Metallurgy. Extra Radio blades—6 for 40c."

"The Ever-Ready was always considered the best safety razor regardless of price."

"They are the best safety razors made at any price."

"A fitting container for the Ever-Ready Marvel, *the finest of all safety razors*—and for Ever-Ready Radio blades, the *keenest cutting edges known to science*."

"Past reputations can't make bad blades give good shaves. *Ever-Ready is the one and only hundred per-center.*" "Use the new Ever-Ready blades—they're the keenest edge in the world." "The new Ever-Ready blades are better than the best of any other make."

"Blades. Try out the Ever-Ready and you'll throw out the others." "To-day the new Ever-Ready is 20 years ahead of the next best make."

"Quit the razor that can't give you 100% perfect blades and shaves. *Switch to the Ever-Ready.*" "Each Ever-Ready in every package is guaranteed *to outshave and outlast any other make*. This isn't a mere advertising claim but a statement of fact which we ask you to test at our risk and if your present razor does not fit the Ever-Ready Blades, buy an Ever-Ready Razor." "No other blade made will shave you as quickly, as cleanly, or as often as the Ever-Ready." "Ever-Ready blades run 100% perfect to the package. *Can you honestly say this of your present blades?*"

"There is no question—the new Ever-Ready blade is keener, more durable, more uniform and in every way more satisfactory than *any other blade made*." "Blades. Try out the Ever-Ready and you'll *throw out the others*."

"Adopted by Uncle Sam for Army and Navy." "Best, irrespective of price." "The Ever-Ready is the only dollar razor that has thorough guaranteed distribution of blade supply in France and England."

"The only dollar razor that can be of service abroad." "The razor with blade service 'over there.'" "Ever-Ready Army Razor."

"X3X Temper—a new secret process *exclusive to Ever-Ready makers*—has made the Ever-Ready Blade a better blade than ever."

In commenting on the matter of this advertising, complainant's counsel described it as ordinary business puffing, and refused to see anything sinister in it. I am unable to agree with this viewpoint. To me it appears perfectly clear that, if the public knew the truth, it would buy that blade of complainant which is sold at the smallest price, and that its ignorance is costing it money without warrant every time it buys a blade at any figure beyond the minimum. Complainant's counsel talks about greater exploitation expenses, and urges that fact as one reason for a larger selling price. Why should a vendor be able to collect from a purchaser, as a part of the purchase price, money which has been spent in an effort to mislead that very purchaser in making that very purchase? I cannot see it.

As previously suggested, I have taken this matter up without regard to formal pleadings, but for the reason that the public's rights seem to be largely involved, and much more liable to injury through the complainant's practices than through those of the defendants. Any purchaser who pays the most ordinary degree of attention to the defendants' present literature and advertising will know the exact truth, while from the complainant's literature and advertising the keenest mind could not fathom the actual facts. And failure to know the truth imposes a financial penalty on every person who pays more than the minimum price for one of complainant's razor blades.

I am therefore of the opinion that, by reason of the character of complainant's advertising and literature, it has fallen far short of that standard of integrity which is required of a petitioner who seeks relief in a court of equity, and that this shortcoming affects its entire case against the defendants.

The complaint is therefore dismissed, with costs.