## Commonwealth *v.* Lund, Appellant.

Argued October 1, 1940.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER, RHODES and HIRT, JJ.

The facts are stated in the opinion of the lower court,
by READER, P. J., as follows:

The defendant in the above entitled case was in-
dicted on March 5, 1940, charged with maintaining a
lottery. In the true bill returned by the Grand Jury in

session at that time two counts were found against the defendant. These counts read as follows:

"...... unlawfully then and there did publicly and privately erect, set up, open make and draw a certain common nuisance, to wit: a certain lottery for monies, goods, wares, merchandise, chattels, lands, tenements, hereditaments and certain other matters and things."

\* \* \*

"...... unlawfully then and there was concerned in divers ways and manners in the managing, conducting and carrying on of the said certain common nuisance, to-wit: the said certain lottery for monies, goods, wares, merchandise, chattels, lands, tenaments, hereditaments and certain other matters and things."

Thereafter the defendant signified, in writing, his desire that the issue involved be tried before a Judge without a jury, in accordance with the provisions of the Act of June 11, 1935, P. L. 319 (19 P. S. 786, etc). The Court consented to such a trial, as appears from the written request of defendant and the consent of the Court and District Attorney filed with the papers in the case. The case was tried before the writer of this opinion on Wednesday, March 20, 1940. At this time testimony was taken at length. This testimony has been reduced to longhand by the stenographer, and is filed with the papers in the case. Thereafter extensive briefs were filed by the District Attorney representing the Commonwealth, and by counsel for the defendant.

The indictment is based upon Section 601 of the Criminal Act of June 24, 1939, P. L. 872 (18 P. S. 4601). This section reads as follows:

"All lotteries, whether public or private, for moneys, goods, wares or merchandise, chattels, lands, tenements, hereditaments, or other matters or things whatsoever, are hereby declared to be common nuisances. Every grant, bargain, sale, conveyance or transfer of any goods

or chattels, lands, tenements or hereditaments, which shall be made in pursuance of any such lottery, is hereby declared to be invalid and void.

"Whoever, either publicly or privately, erects, sets up, opens, makes or draws any lottery, or is in any way concerned in the managing, conducting or carrying on the same, is guilty of a misdemeanor, and on conviction thereof, shall be sentenced to pay a fine not exceeding five hundred dollars, or undergo imprisonment, by separate or solitary confinement at labor, not exceeding one (1) year, or both."

It will be observed that the statute does not specifically define the term "lottery". The meaning of that term, however, has been established by the decisions of the Courts in many cases. One of the most recent definitions is that found in the case of *Commonwealth v. Banks*, 98 Pa. Superior Ct. 432, 435: "In *Com. v. Manderfield*, 8 Phila. 457, 459, Judge PAXSON defined a lottery to be 'A scheme for the distribution of prizes by chance,' which is practically the same as Webster's definition; and in *Com. v. Sheriff*, 10 Phila. 203, 204, he said: 'Whatever amounts to this, no matter how ingeniously the object of it may be concealed, is a lottery.' WORCESTER defines it: 'A game of hazard in which small sums are ventured for the chance of obtaining a larger value either in money or in other articles.' The Century Dictionary says: 'In law the term "lottery" embraces all schemes for the distribution of prizes by chance, such as policy playing, gift exhibitions, prize concerts, raffles at fairs, &c., and includes various forms of gambling.' In *Hull v. Ruggles*, 56 N. Y. 424, 427, the Court of Appeals defined it as follows: 'Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to have for it, that is a lottery.' This fits our case exactly; so does the definition in

Bishop on Statutory Crimes, Sec. 952 (3d Ed.): 'A lottery may be defined to be any scheme whereby one, on paying money or other valuable thing to another becomes entitled to receive from him such a return in value or nothing as some formula of chance may determine.' "

The devices resorted to at different times in establishing and conducting lotteries have been various. It is well settled however, that no matter how new the artifice it is within the condemnation of the law if it in effect embodies the principle of a lottery and operates as such. In the case of *Commonwealth v. Banks,* above cited, this rule is laid down, referring to the argument of the defendant in that case that the scheme which he was operating, and which was alleged to be a lottery, was unknown at the time of the enactment of the Criminal Code of 1860:

"He argues that as the Act of February 17, 1762 (1 Sm. L. 246), forbade 'lotteries' in much the same terms as the Act of 1860, the term must be limited to such forms of lottery as were then known and legislated against and cannot be applied to a scheme not then in existence. Practically the same contention was made as long ago as 1818 and decided adversely to the appellant. In *Seidenbender v. Charles,* 4 S. & R. 151, 164, [8 Am. Dec. 682] Judge GIBSON said on this point: 'I grant the legislature may not have had his particular kind of lottery in view, but was it intended to restrain the operation (of the Act of 1762) to those particular kinds of lotteries then in use, and to those only? I apprehend not. It is very clear that a particular kind of mischief, differing not in form or substance, but in degree only from the one under consideration, and only less pernicious in its consequences, first induced the legislature to act on the subject. Shall the letter, which is sufficiently comprehensive to embrace this case, be re-

strained to the particular mischief then existing, and exclude one of the very same stamp, merely because it was not then practiced? This surely would not be a sound construction ...... We are bound to extend it to every case within the letter, which we can suppose would, if foreseen, have been specially provided for.'

"The Act of 1860 does not define 'lottery'; the prohibition is general. Our concern, therefore, is to see whether the scheme conducted by the appellant may reasonably and fairly be included within the term as commonly used and understood."

In practically all jurisdictions whose decisions have come to our attention lotteries are similarly defined. It is universally held that to constitute a lottery there must be present the three elements, of a prize to be won, the determination of the winner by chance, and a consideration. The scheme operated by the defendant in this case, and which is the basis of the indictment, is that commonly known as "Bank Night".

From a consideration of the many cases cited to us by counsel it seems that the scheme known as "Bank Night" is operated generally in about the same manner everywhere, though there may be slight variations in the method. From the evidence before us in this case it appears that the scheme was organized and operated in the following manner by the defendant:

The defendant operates, and at the time of the matters herein charged was operating, two theatres in the borough of Aliquippa, Beaver County, Pennsylvania, one known as the "State" theatre, the other as the "Strand". The State theatre is the larger of the two, and the drawing was conducted in this theatre, the results, however, being announced also in the Strand.

The theatre owner or manager has a register in which is listed the names of all persons who choose to list their names as potential winners of a prize. Opposite each name in the register is a number, each person

registering being assigned a different number. According to J. C. Lund there are some 24,000 people registered in the register of the State Theatre in Aliquippa. This theatre has a seating capacity of 1,400. It cost nothing to get your name in the register as a potential winner of a prize. This is the first step in the drawing.

The next step in the drawing is to place the numbers in a large barrel-shaped hopper corresponding to the numbers of the persons who have registered. There is a drawing one night each week. The barrel-shaped hopper containing all of the numbers of the people who have registered being placed on the stage of the theatre and one of the numbers out of the 24,000 is drawn.

The next step in the drawing is for the person whose number is thus drawn to be present, at either the State or the Strand theatres (both under the same management) on the evening of the drawing and to present himself as the winner when his name is announced from the stage. If he be not present, there is no award made, but the amount of the prize is augumented the following week by adding thereto a further sum equal to the sum proposed to be awarded at the first drawing. On the second Wednesday night there is thus $150 for a prize to be awarded to the person present in the theatre at the time of the drawing if his number happens to be drawn out of the barrel-shaped hopper. If there be no winner on the second night, then the third Wednesday a similar process is gone through and the prize has now reached $225. On the fourth night a similar process is gone through and if there still be no winner, the prize is $250 and an additional prize in the sum of $50 to a second potential winner whose name might be drawn from the hopper. In no event does any prize exceed $250, but in the event no award is made for the reason that the winner is not present at the theatre, a second prize is built up until it reaches $250, and the prize

money is thus increased from week to week and the number of potential winners is increased from week to week until finally someone wins.

An added feature not usually found in "bank night" cases is to be found in the Aliquippa theatre system, namely, when the prize money for the winners has reached the sum of $400 and no one has claimed the money for the reason that the winners were not present at the time of drawing, consolation prizes are drawn from a separate hopper. These prizes are in the amount of $10 each and in the number of five, and separate award is made of these prizes to persons present in the theatre. These potential winners get their chances by paying an admission to the theatre and being given by the usher a stub which the theatre patron retains. On this stub there is a number, the duplicate of this stub being placed by the usher in a separate hopper and drawn by someone in the audience. Some time during the evening, the number is announced from the stage and the winner, who is bound to be in the audience, is given the $10 prize. These stubs with numbers on are sometimes given to the few patrons of the theatre who go in on passes, and they can win even though they have not bought a ticket at the box office, but naturally they form a very small portion of the audience, the greater majority of the potential winners paying for their numbered stubs by paying the admission price at the theatre box office.

An additional feature of the Aliquippa theatre system is that you can buy a proxy card in the afternoon of the day of the drawing by buying an admission ticket to the theatre, and the patron of the theatre who thus attends in the afternoon, can sign a proxy card, which proxy card is placed in a file for the evening performance. If that patron's name comes out as a winner of the "bank night" drawing, he gets the prize by being present in proxy. Sometimes proxy cards are

given away by the theatre owner or manager and they are given away in every case where a person finds out that they can be secured without any admission price, but the theatre does not advertise this feature for fear that too many people will apply for proxy cards without paying an admission price. The theatre keeps this feature a dark secret, because, as the defendant himself said from the witness stand, "We would not be in the business long if all of the people of Aliquippa found out that they could get a proxy card for nothing."

Prior to the inauguration of the "bank night" system at the Aliquippa theatre, the theatre operated at a loss of $17,000 for the year. Since inaugurating the "bank night" scheme the theatre is operating in the "blue", this increase in receipts being attributed to the stimulation of "bank night". It also appears from the testimony of Mr. Lund that his theatres, since the introduction of "bank night", have played to close to 4000 people on those special days, while on other days the attendance might be as low as 250.

The decision of the various jurisdictions present two types of "bank night" schemes. One is commonly referred to as the "closed participation" scheme, and the other as the "flexible participation" scheme. In the "closed participation" system, as applied to theatre "bank nights", an admission price must be paid to the theatre owner for a theatre ticket in order that the person so purchasing may be assigned a number which is drawn by chance, or lot, in some manner. There need be no increase in the price of the theatre ticket purchased by the possible winner, the price paid for the ticket including the price paid for the chance. In the so-called "flexible participation" schemes some sort of method is employed by means of which some persons get chances to win without purchasing any theatre ticket.

As above noted in the statement of the manner in

which defendant conducted "bank night" at his theatres, this element of flexibility was introduced by the allowance of persons to win upon their tickets either by being present in person, or by being present by proxy. This device is introduced, of course, for the purpose of evading the law against lotteries.

It is universally held, and is conceded in this case, that a drawing conducted upon the basis of a "closed participation" is a lottery, even though the price or cost of the chance is included in the original price of the theatre ticket. In other words, in such a scheme the purchase of the ticket and the fact that one cannot contend for the prize unless he has purchased such a ticket, establishes the fact of consideration. This has been held in many cases, and we think this phase of the case requires no further discussion (*Meyer v. State*, 112 Ga. 20; *Standridge v. W. B. R. Co.*, 148 Ga. 283, 96 S. E. 498; *Lohman v. State*, 81 Ind. 15; *Dunn v. People*, 40 Ill. 465; *Davenport v. Ottawa* (Kan.), 39 Pac. 708; *State v. Boneil* (La.) 8 So. 298; *Ballock v. State*, 73 Md. 1; *Glover et al. v. Malloska*, 238 Mich. 216, 213 N. W. 107; *State v. Powell et al.*, 170 Minn. 239; *State v. Emerson*, 318 Mo. 633; *State ex rel. v. Hughes*, 299 Mo. 529; *State v. Clarke*, 33 N. H. 329; *State v. Shorts et al.*, 32 N. J. L. 398; *State v. Bryant*, 74 N. C. 207; *Carl Co. v. Lennon* (N. Y.) 86 Misc. 255, 148 N. Y. S. 375; *People v. Miller et al.*, 285 N. Y. S. 1079; 271 N. Y. 44, 2 N. E. (2d) 38; *Rountree v. Ingle*, 94 S. C. 231, 87 S. E. 931; *Bell v. State* (Tenn.), 5 Sneed 507; *Featherstone v. Association* (Tex.), 10 S. W. (2) 124; *Randle v. State*, 42 Tex. 580; *Blair v. Lowham*, 73 Utah 599, 276 Pac. 292; *Society et al. v. Seattle*, 118 Wash. 258; 203 Pac. 21; *U. S. v. Wallis*, 58 Fed. (D. C.) 942; *Horner v. U. S.*, 147 U. S. 449, 13 Sup. 409; *Taylor v. Smetten*, 11. Q. B. D. 207; *Hall v. McWilliam*, 85 L. T. N. S. 239; *Kerslake v. Knight*, 41 Times L. R. 555; *Rex v. Hudson Bay Co.*, 9 Alberta L. R. 227; *Morris v. Black-*

*man,* 2 Hurlst & C. 913; 159 E. R. 378; *Minty v. Sylvester,* 114 L. T. N. S. 164.)

In the case before us it is conceded that the elements of prize and chance are present. It is contended by the defendant, however, that by reason of the scheme operated by him having been a "flexible participation" scheme, in the respects hereinbefore noted, the element of consideration is lacking, and therefore the "bank night" scheme as operated by him does not constitute a lottery.

In support of this position counsel for defendant have called to our attention a number of cases which seem to support it. One of the leading cases on this question is the case of *Yellowstone Kit v. The State,* 88 Ala. 196, 7 So. 338. This case has given the name to a line of other cases in which it has been followed. In this case, it appearing that persons might win a prize without having paid for a chance, the Court held that the practice, as conducted, did not constitute a lottery. The Court said, among other things:

"It may be safely asserted, as the result of adjudged cases, that the species of lottery, the carrying on of which is intended to be prohibited as criminal by the various laws of this country, embraces only schemes in which a valuable consideration of some kind is paid, directly or indirectly, for the chance to draw a prize . . . . . . 'There is no law which prohibits the gratuitous distribution of one's property by lot or chance. If the distribution is a pure gift or bounty, and not in name or pretense merely, which is designed to evade the law, if it be entirely unsupported by any valuable consideration moving from the taker,—there is nothing in this mode of conferring it which is violative of the policy of our Statutes condemning lotteries or gaming. We may go further and say that there may seem to be nothing contrary to public policy, or *per se* morally wrong, in the determination of rights by lot. A member of

the College of Christian Apostles, as sacred history informs us, was once chosen by lot ...... .

" ' ...... The suspicion, even though well founded, that these presents may have been given away in order to induce a larger crowd to assemble at the defendant's performance ...... would be too remote to constitute a legal consideration for the tickets ......

" ' ...... The element of gaming which is wanting to constitute this transaction a lottery is the fact that no money was paid, directly or indirectly, for the chance of receiving a prize, or of participating in the distribution by lot.' "

A more recent case in the same line, and involving the "bank night" practice, is that of *State v. Eames,* 87 N. H. 477, 183 Atl. 590.

"The authorities are in agreement upon the proposition that three elements must be present in order to constitute a lottery within the meaning of that word as used in criminal statutes. These three elements are: (1) A prize; (2) chance; (3) consideration. Both the state and the defendant agree that the first two elements are present in 'Bank Night.' The issue between them is over the element of consideration.

" ...... While it is abundantly clear from our statute and from all the authorities that it is perfectly legal to make a gift the recipient of which is selected by chance, it is equally clear that one may not obtain immunity from prosecution under the lottery law by resort to the device of a pretended gift. This subterfuge has been repeatedly before the courts, and in every instance the courts have looked beyond the names used and have dealt realistically with the situation presented.

" ...... The problem presented by 'Bank Night' and similar schemes is to determine whether it is an evasion of the statute or an avoidance of it, and this question is essentially one of fact. In answering this question, we do not propose to close our eyes to reality. The

test by which to determine the answer to this question is not to inquire into the theoretical possibilities of the scheme, but to examine it in actual practical operation. If, as the state contends in its brief, although this contention does not appear to be borne out by the agreed facts, 'the great majority of people pay for such privilege,' then it is an evasion and as such is not to be countenanced. As we understand the actual situation of this case, however, free participation is a reality. If this is so, then, regardless of the motive which induced the defendant to give such free participation, the scheme is not within the ban of the statute. Violation is shown only when, regardless of the subtlety of the devices employed, the state can prove that, as a matter of fact, the scheme in actual operation results in the payment, in the great majority of cases, of something of value for the opportunity to participate.

Another case to the same effect is the California case of *People v. Cardas,* 28 Pac. (2d) 99. In this case the Court said: "Was a valuable consideration paid for the chance of winning the prize by those who stood to win? Stated another way, was anything of value hazarded upon the chance by them? Counsel for the People argue that patronage from the ticket holders as a whole constituted consideration for the distribution of prizes, even though the individual holders of tickets had not parted with consideration for the individual tickets held by them. This argument apparently proceeds upon the theory that the element of consideration was established by showing that the defendant received something of value in return for the distribution of the prizes. The question of consideration is not to be determined from the standpoint of the defendant but from that of the holders of prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for

the chance of getting the prize. They did not hazard anything of value. It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office, but from another employee, could not be said to have paid a consideration for the prize tickets since they could have received them free."

In addition to the cases cited our attention has been called to the following cases in which the decisions of the Courts sustain the position of defendant: *Cross v. People,* 18 Colo. 321, 32 Pac. 821; *People v. Mail and Express Company,* 179 N. Y. S. 640; *State v. Hundling,* (Iowa) 264 N. W. 608; *City of Roswell v. Jones,* (New Mexico) 67 Pac. (2d) 286.

It seems to us that the principle involved in these decisions is that whether a particular scheme is to be regarded as a lottery or otherwise is to be determined by ascertaining whether anyone may possibly win a prize through the operation of the scheme without having paid for the chance to win. Thus in the case of *People v. Cardas,* above quoted, the Court said:

"The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize."

In *Ex Parte Cecil Grimes v. State,* (1937) 235 Ala. 192, 178 So. 73, the Supreme Court of Alabama, which decided the case of *Yellowstone Kit v. The State* above referred to, seems to have taken the view of the character of "bank night" adopted in many of the cases to which we shall later refer. It refrains from reversing the Yellowstone Kit case, but apparently does not apply to the "bank night" cases the rule followed in the earlier case.

After a careful study of many of the decided cases, we are of the opinion that the conclusion stated in the cases hereinbefore considered is not sound. We think the courts have erred in their approach to the real question involved. Our statute, and apparently most of the statutes prohibiting lotteries, are directed against the person or persons establishing, organizing, or conducting a lottery. Our own statute begins by declaring all lotteries, public or private, to be common nuisances. It is this general and public effect of the system which brings it under condemnation. This is because of the tendency of such systems and practices to inflame the gambling instinct, and to corrupt public morals. The primary question in these "bank night" cases is not whether any individual attending a theatre on "bank night," paying for admission, or admitted free, present in person or by proxy, is acting in concert with the owner in operating a lottery, but rather whether the owner is maintaining and operating a lottery. This is to be determined by the character and practical operation of the scheme as a whole, and not by rare instances of departure from the general scheme and practice. The general character of the system is not to be determined by splitting it up into individual contracts between the theater owner and his patrons. This theory applied in the cases hereinbefore considered is a misleading one, since it diverts attention from the general public effect of the practice which is the evil the law seeks to prevent. It is an impractical one in that it would render extremely difficult, if not impossible, the control of the practice, though manifestly a public nuisance in its operation and effect, by permitting a few exceptional instances of free admissions and free chances to afford immunity to the whole. For it must be observed that in order to render effective this defense based on free admissions, such admissions however few must

be held to legalize the entire system. Otherwise the defendants in these cases would always in fact be guilty, for in the case before us, as in every case which has come to our attention, the overwhelming majority of the attendants at the theatre on "bank night" are there by reason of paid admissions.

An examination of the evidence in the instant case seems to us to clearly demonstrate that the system carried on by defendant is as a whole a gambling device, a lottery, and that the very few instances of free admissions and of attendance by proxy, are not essential or substantial parts of the system, but subterfuges only, adopted in an attempt to clothe the system with innocence.

Mr. Lund, testifying with respect to the effect of the introduction of "bank night" upon the business of his theatres, made the following statements (pp. 18, 19):

"Q. Will you explain to the Court to what extent this is a stimulant?

"A. Last year we had to close one of our theatres because business was bad. We dropped about $17,000 loss in the town. And we started the bank night again this year—about twenty-three weeks—and we are showing a profit. It isn't much, the profit, but it stops our losses. The losses in the middle of the week are very extensive, or severe due to the seven-day operation. It gives you an opportunity, running something different in the middle of the week, on a three and one day policy change of picture."

"Q. Since you started the bank night on Wednesdays have you changed from a $17,000 a year loss, so that you are now in the blue?

"A. We are all right at the present time. We are coming along; for this first three months we are really doing fairly well. So it is a stimulant; we are getting the people into the theatre who never went into the

theatre before; and they are people that don't read and write, and if they see action they might come back again; if they don't see action or romance, they don't come back again."

He also testified (p. 25) that while frequently they played to 250 persons in a day, "bank night" frequently raised the attendance to almost 4,000 people.

Again (p. 17), in referring to the fact that it was not necessary that one should buy a ticket in order to be eligible for a prize, he testified as follows:

*"By the Court:*

"Q. But he did not need to have bought a ticket in either instance?

"A. No. Of course, we don't advertise that, because we wouldn't be in business long.

*"By Mr. McCreary:*

"Q. You don't advertise the fact that you can get a proxy ticket for nothing?

"A. No.

"Q. Because you wouldn't be in business long that way?

"A. No.

"Q. But if a person actually finds it out that they can do that, you will accommodate them and give them a proxy ticket?

"A. Yes."

With reference to the fund out of which prizes are paid he testified as follows (p. 21):

"Q. Now the bank fund out of which the prizes are paid is simply your money; it isn't a fund accumulated by any special contributions?

"A. No, we use a check. This is a method of advertising; that way we charge it off to advertising."

As part of the evidence there was presented the stenographer's notes of the proceedings at the State Theatre of Aliquippa on January 17, 1940, at nine o'clock P. M. This was "bank night," and the pro-

ceedings were reported by one of our Court Stenographers at the request of the District Attorney. Mr. Lund admitted that this was a correct record of what was said by him at the theatre on this evening. He announced that one might be present by proxy and so receive a prize; did not call attention to the fact that a ticket need not be purchased, evidently for the reason stated in his testimony above quoted.

The evidence referred to establishes beyond all question that the establishment and operation of "bank night" at defendant's theatres greatly increased the attendance on those nights. Practically all of these attendants paid an admission fee. It seems to us that it must be evident that their attendance at this time must not have been primarily to see the show, as otherwise the difference in attendance on this and other occasions would be unaccounted for. They paid to be present at the drawing, in itself probably an interesting and exciting feature of the show, and also affording each of them at least the possibility of winning a prize. This increased attendance and revenue to the defendant is a very substantial consideration to him, and is the basis for the awarding of the prizes. The whole transaction is characterized by these facts. The practice, according to Mr. Lund's statement, could not be continued except upon the basis of paid admissions. As above quoted, he stated that they could not advertise the matter of free admissions and free chances for prizes and continue in business.

We are satisfied that an application of the principles which we have last stated to the evidence before us brings this case clearly within the rulings of many decisions holding that even the "flexible participation bank night" is a lottery. There are many such cases decided in England, and in various jurisdictions in this country. We call attention to a few of them only which seem to us to clearly establish what seems to us

to be the sound conclusion as to all of these "bank night" practices, whether they are characterized as "closed participation" or as "flexible participation" undertakings.

One of the most interesting cases to which our attention has been called is the English case of *Willis v. Young et al.*, (1907) 1 K. B. 448, 3 B. R. C. 976. In this case the English Court considered a "flexible participation" scheme designed and used by the proprietor of the Weekly Telegraph of London to increase the circulation of that paper. We are summarizing the facts in this case substantially as presented in a work entitled "Flexible Participation Lotteries" by Francis Emmett Williams, of the St. Louis Bar:

"There the Weekly Telegraph made a general distribution of numbered medals to the homes of the people throughout London and the surrounding country. Each medal carried a serial number and the words 'Keep this, it may be worth 100 (Pounds). See the Weekly Telegraph Today'. A drawing was had each week and the winning numbers were published in the Weekly Telegraph. Every precaution was taken to keep the sale of papers separate from the distribution of medals and the winners were given several days in which to claim their prizes. Many places were maintained in London where persons could read the paper without having to buy a copy. The scheme was more liberal in its terms and much more elaborate in its precautions than 'bank night.'

"When prosecuted for violating the lottery laws, the defense was that the scheme was legitimate advertising and not a lottery; that the distribution of medals and the award of prizes were gratuitous; that the risk of loss was absent from the scheme; that the holder of a medal gave nothing for it; and that the purchase of a copy of the paper was independent of the ownership of a medal."

This was held to be a lottery. The essential principle involved in the case seems to have been stated in the question asked by Chief Justice, Lord ALVERSTONE:

"Looking at the whole of the circumstances of the case, is it not plain that the circulation of the paper increased by reason of people getting these medals?" The Court held, in substance, that the scheme was but an ingenious device to evade the law prohibiting lotteries; that many recipients of the medals, unable to go to an office to inspect the paper, would buy one to see if their medal number was a lucky one; that the persons who received the medals contributed collectively to a fund belonging to the newspaper, even though each individual did not contribute, and that therefore all the opportunities to participate in the drawings were paid for in the mass by the general body of purchasers of the paper; and that looking at the substance and manner of operation of the scheme as a whole, it fell within the definition of a lottery.

A somewhat similar scheme, designed and put in operation by The Star, another English newspaper, was in like manner held to be a lottery in the case of *Rex v. Chattaway,* 173 L. T. J. 155.

The case of *Willis v. Young,* above referred to, was followed in the Ohio case of *State v. Bader,* 21 Ohio Law Report 293. In this case William Bader operated a very pretentious cafeteria in Cincinnati. He advertised in the newspapers that he was making a gift of an automobile, and urged persons to obtain tickets which would enable them to have a chance upon this automobile. In the window of his establishment he displayed an automobile worth about $1300, with a notice opposite it stating that the automobile was to be given away free and urging persons to come in and get tickets. These tickets bore the words "Meet me at Bader's". They were given to patrons of the cafeteria who paid their way, and to persons who asked

228

for tickets who made no purchases. It appeared that in at least one instance one hundred tickets were given to a friend for free distribution among his friends. Notwithstanding the issuing of certain free tickets the Court held that the elements of prize, chance and consideration were all present, and that the plan involving the issuing of the free tickets was so designed merely to evade the provisions of the lottery law.

In the case of *Affiliated Enterprises, Inc. v. Waller*, 5 Atl. 2nd Series, 257, decided by the Supreme Court of Delaware, on March 14, 1939, the Court passed upon what was in effect a "flexible participation" scheme. In this case the plaintiff sued the defendant for breach of a license agreement by which the defendant was licensed to operate in its theatre a plan, or scheme, known as "bank night". The question involved was whether the scheme constituted a lottery in the State of Delaware. It was stated that the elements of prize and chance were present. The defendant, however, contended that the scheme was not a lottery because it was possible for persons to receive prizes who paid nothing for the chance. After reviewing fully the facts in the case, and the decisions, the Court held that the scheme was a lottery. In its opinion the Court said:

"Motion picture theatres are not charitable enterprises. In holding out offers of an award of the kind and in the manner disclosed by the contract, they are not moved by a spirit of brotherly love, sympathy for the poor to the end that they may enjoy a more abundant life, or warmth of heart in any degree. With them it is a cold-blooded business device, embraced with hope and expectancy of filling their theatres with paying patrons. They proceed upon the notorious fact that there is nascent in the human breast a gambling instinct; that the average human is avid of an opportunity to gain much at a small risk; and that this instinct and passion is likely to blossom upon slight

nourishment. They know that this spirit is with the old and young, the weak and strong, without regard to sex. So, building their faith upon well known human traits, they confidently offer the opportunity to all persons who will register and attend at or in the theatre, well knowing that many of those who are attracted by the offer will purchase tickets of admission, not only to avoid the physical fatigue incident to standing in the lobby or the adjacent street, and the discomfort arising from weather conditions or a jostling crowd, but also to see the picture displayed, sit in comfort and secure in the knowledge that they are present to see the drawing of the prize and prepared to declare their presence promptly if fortune should smile upon them. The gambling instinct is aroused; and it is intensified if, according to the scheme, the person whose number is called is not present, and the amount of the award is added to that of the next drawing. The prize grows in size; the attendance increases. The theatre prospers; and greed, envy and other evils inherent in lotteries are encouraged.

"The deceit in schemes of this nature lies in the pretense of allowing free participation, but at the same time surrounding the opportunity with conditions calculated upon a knowledge of human characteristics to induce those attracted by the offer to purchase tickets of admission to the theatre. Looking behind the pretense, and disregarding legalism, nothing is given away. All of the prizes, disarmingly called gratuities, are supported by a mass contribution. The opportunities to participate in the drawing are paid for collectively by the general body of paying patrons, even though individual participants may not pay; and the fund, out of which the prize money and the profits of the theatre come, is created thereby. *Willis v. Young et al.*, 1907, 1 K. B. 448."

The case of *State v. La Crosse Theatres Co.*, 286 N.

W. 707, was decided by the Supreme Court of Wisconsin on June 21, 1939. It involved the same question as to the presence of consideration passed upon in the cases last referred to. In this case the Court said:

"The defendant insists that the element of consideration is absent; the state insists that it is present because of the increased number of ticket sales for admission on Bank Night; and that while the individual drawing the winning number may not buy any ticket, and thus pay no consideration for his chance for the prize, yet the theatre receives a consideration for allowing him his chance in the increased number of tickets sold to others for admission on the night of the drawing. It is, of course, manifest that the theatre receives from its sale of tickets enough to make it pay to maintain the practice, else it would not continue it. Upon the question of whether the additional sales induced by the offering of the prize constitutes a consideration, the courts are divided ......

"...... The reason most generally given for holding the scheme a lottery is that the great number of those who purchase tickets for the chance of participating in the drawing, thus making the scheme profitable to the theatre, furnish the consideration, although others are given chances free. Others base their ruling upon the fact, or at least place emphasis upon it, that the furnishing [of] free chances is only a means taken to evade the point of necessary consideration and thus save the scheme from being held a lottery. We agree with the majority of the courts and hold that the instant scheme constitutes a lottery. Manifestly, a lottery is no less a lottery because the management of it gives away numbers entitling participation in the drawing to some persons. It is only all the more objectionable because it does not limit the drawees to the persons buying tickets and thus lessens the chance of those who pay for their tickets."

The case of *State v. Wilson,* 196 Atl. 757, was decided by the Supreme Court of Vermont on February 1, 1938. The plan considered in this case was known as "cash night". It was in substance, however, the same as "bank night". Under its provisions it was not necessary to purchase a ticket of admission to the theatre to participate in the drawing. The Court held that the scheme was a lottery, and said in its opinion:

"Whether the scheme is no less a lottery when the purchase of a ticket is not required, and the drawing is open to those registrants who have paid no admission, as well as to those who have, is a question upon which the authorities are not harmonious. This sort of operation, sometimes called 'Bank Night,' is identical with the 'Cash Night' described in the complaint. It is said in *Commonwealth v. Wall,* Mass., 3 N. E. 2nd 28, 30: A game does not cease to be a lottery because some, or even many, of the players, are admitted to play free, so long as others continue to pay for their chances ...... So here the test is not whether it was possible to win without paying for admission to the theatre. The test is whether that group who did pay for admission were paying in part for the chance of a prize.' In *Iris Amusement Corporation v. Kelly,* 366 Ill. 256, 8 N. E. 2nd, 648, 653 the court said: 'We may look at this thing realistically and sensibly. We know that those within the theatre pay for any chance any one outside may have to win. And in *State ex rel. Hunter, Attorney General v. Fox Beatrice Theatre Corporation,* [133 Neb. 392], 275 N. W. 605, 606 the court said: 'They (the purchasers of tickets) made a contribution to increased income out of which a prize could be paid, a fund created by many to be drawn by the holder of a single lucky number on a tiny card. This contribution, under the practical operation of "Bank Night," is the consideration actually paid ...... for a chance for a prize and it is no less effective for that purpose because large numbers of registrants do not pay for theatre tickets or occupy seats at the draw-

ing. The prize offered to a registrant without a theatre ticket, if he can personally claim it within two minutes after the drawing though outside at the time, is a cloak to hide an evil design and to evade or cheat the law.' "

One of the latest decisions to the same effect is that of *Commonwealth v. Heffner*, 24 N. E. (2d) 508. This case was decided by the Supreme Judicial Court of Massachusetts on December 27, 1939. The Court sustained the conviction of a defendant who had been found guilty of setting up and promoting a lottery, although the scheme, as in the cases last cited, provided for a chance to participate without paying an admission fee. The Court held that "flexible participation" schemes are lotteries "if those who paid for admission paid in part for a chance for a prize."

Such quotations might be multiplied almost indefinitely from decisions in the various jurisdictions in this country. In addition to the cases already referred to some of the most instructive are the following: *City of Wink v. Griffith Amusement Co.*, 100 S. W. (2d) 695 (Texas); *State v. McEwan*, 120 S. W. (2d) 1098; *State v. Danz*, 250 Pac. 37 (Washington): *Glover v. Malloska*, 213 N. W. 107 (Michigan); *State ex rel. v. The Fox Kansas Theatre Co.*, 144 Kan. 687.

There seem to be no decisions upon the questions involved by the appellate courts of Pennsylvania. There are, however, several decisions of lower courts in this State passing upon the question of what constitutes a lottery (*Main v. Mackey*, 39 County Court Reports 589; *Commonwealth v. Sheriff*, 10 Phila. 203; *Commonwealth v. Manderfield*, 27 Legal Intelligencer 86; *Commonwealth v. Painter*, 15 D. R. 491).

In the case of *Meadville Park Theatre Corporation v. Albert A. Mook, District Attorney*, 337 Pa. 21, an attempt was made to restrain the District Attorney from prosecuting the Theatre Corporation for maintaining a lottery by reason of the fact that it was

conducting a "bank night" scheme. The Court of Common Pleas of Crawford County reached the conclusion that the scheme was not a lottery. Upon the appeal of the case to the Supreme Court, the Supreme Court reversed the lower Court on the ground that the court below had no authority to restrain the District Attorney of Crawford County proceeding criminally against the Theatre Corporation. The question of the legality of "bank night" was not passed upon by the appellate court.

The only other Pennsylvania case called to our attention is the equity case of Morris Somerson, doing business as *Palm Theatre, v. S. Davis Wilson, Mayor, and others,* in the Court of Common Pleas No. 1 of Philadelphia County, at No. 350 March Term, 1937. The plaintiff in this case operated the Palm Theatre in the City of Philadelphia, and there carried on a game called "Lucky". He brought the bill in equity at the proceeding referred to, to restrain the officials of the city of Philadelphia from interfering with the conduct of this game. This game is substantially the same as "bank night", and is of the "flexible participation" character. The Court held the scheme to be a lottery and dismissed the bill, the opinion being written by Judge McDevitt. In the opinion Judge McDevitt said, among other things:

"It is argued that the games are an advertising attraction for the theatre, and that they are conducted solely for that purpose and not to flout the law.

"Where the distribution of one's property is purely a gift or bounty and not in the name of pretense designed merely to evade the law—if it be entirely unsupported by any valuable consideration moving from the taker—there is nothing in this method of conferring it which is in violation of the policy of our statutes. What may appear at first blush to be a gratuitous distribution of properties has, however, frequently been

defined and denounced as a device or artifice to evade the law.

"It has been argued that because persons who do not attend the theatre, and who never have paid any admission fee for a chance to win, the element of consideration or price is lacking and that avoids a violation of the law governing such gambling or lottery, because paying an admission to the theatre adds nothing to the chance.

"The test by which to determine the answer is not to inquire into the theoretical possibilities of the scheme, but to examine it in actual, practical operation. A great majority of people pay for the privilege, and therefore it becomes an evasion of the law, and as such cannot be countenanced. Free participation must be a reality rather than chimerical, and the matter is controlled by our criminal as well as our civil law.

"If in the flourishing days of the Louisiana lottery, perhaps the most famous lottery, its management had advertised that it would give a free ticket to the principal of every school in the city of New Orleans, that would not have changed the scheme from a lottery, whether or not any one or all of such free tickets, were accepted.

"The test should not be whether it is possible to win without paying for admission to the theatre, but whether the group that did pay for admission were paying in part for a chance or a prize."

From a consideration of all of the facts in evidence before us, and from a study of many of the cases brought to our attention, including those hereinbefore discussed, we are satisfied that the "bank night" scheme operated by the defendant at his theatres in the borough of Aliquippa, in this county, is a lottery. We think the true test of the term and its character in this respect is that which we have hereinbefore stated, and

which we think is supported by the long line of decisions last referred to.

In our study of the case we have been assisted by the briefs of counsel and by additional briefs submitted by the District Attorney, including the article of William N. Hensley of San Antonio Texas, published in The American Lawyer, Vol. 1, No. 1, page 5; the very extensive brief and opinion prepared and furnished by the Solicitor of the Post Office Department to that Department, and upon the basis of which Affiliated Enterprises, Inc., which licensed local theatres to operate the "bank night" scheme, was excluded from the United States Mail; and the very exhaustive discussion of the various features of such schemes found in the book hereinbefore referred to "Flexible Participation Lotteries" by Francis Emmett Williams.

While we are satisfied that the defendant has been guilty of maintaining and operating a lottery in his theatres in the borough of Aliquippa, in this county, and that judgment to this effect must be entered against him, we are satisfied that the attitude of the defendant throughout the trial merits favorable consideration. The whole case of the Commonwealth rests upon his testimony. Although advised that he need not testify, he very frankly presented all the details of the system operated in his theatres. His purpose, no doubt, as well as that of the District Attorney has been, if possible, to make a test case of this transaction. The matters referred to, however, we think should be taken into consideration when we come to the point of imposing a penalty.

## ORDER

Now, to-wit: May 31, 1940, it is hereby ordered, adjudged and decreed that the defendant, J. C. Lund, in setting up and conducting the system or practice known as "Bank Night", in his theatres "State Theatre" and "Strand Theatre" in the borough of Aliquippa, Beaver

County, Pennsylvania, on the dates set out in the in dictment in the above entitled case and on other dates within the period of the statute of limitations, was in fact and in law setting up, managing, conducting, carrying on and drawing an illegal common nuisance, to-wit: a lottery; and by reason thereof said J. C. Lund is guilty as indicted, of setting up; managing, conducting, carrying on and drawing a lottery for monies, etc.; and said defendant is hereby directed to present himself before the Court for sentence.

Defendant appealed.

*Robert L. Orr*, with him *Reed & Ewing*, for appellant.

*R. E. McCreary*, District Attorney, for appellee.

PER CURIAM, October 9, 1940:

The judgment of the court below is affirmed on the opinion of President Judge READER.

Judgment affirmed, and it is ordered that the defendant appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with the sentence, or any part of it which had not been performed at the time the appeal in this case was made a supersedeas.