## Commonwealth v. Cusano et al.

436

*George H. Weitzman,* assistant district attorney, for Commonwealth.

*John H. Cericola* and *H. Warren Ragot,* for defendants.

BARTHOLD, P. J., August 6, 1951.—Defendants were indicted upon the charge of maintaining a lottery. At the trial before the court and jury, defendant Andrew Cusano was found guilty, and defendant Frank La-Barba was found not guilty. Defendant Andrew Cusano filed motions in arrest of judgment and for a new trial, but upon argument before the court en banc abandoned the motion in arrest of judgment, leaving for determination the motion for a new trial. The principal contention is that the evidence adduced by the Commonwealth does not establish that the drawing conducted in the men's clothing store owned and operated by defendant was a lottery under the law of Pennsylvania. This contention is embodied in the sixth, seventh, eighth and ninth reasons assigned in support of the motion for a new trial, which read:

"6. The Commonwealth has not established by the weight of the evidence and the defendants have not shown by their testimony that in the 'Pennsylvania Plan' there was any consideration which had permanently passed to the defendants in whole or in part, for a chance on a prize to be won.

"7. The verdict of guilty against defendant, Andrew Cusano, was contrary to the evidence.

"8. The verdict was contrary to the weight of the evidence.

"9. The verdict was contrary to the law and the evidence."

The indictment charged that "Andrew Cusano and Frank LaBarba, late of the said county, on or about the 17th day of February, in the year of our Lord, one thousand nine hundred and fifty-one, at the County aforesaid (namely, Northampton County) within the jurisdiction of this Court, did erect, set up, open, make, draw, manage, conduct, and carry on a lottery, for money, goods and merchandise, said lottery being commonly known as a 'suit club,' contrary to the form of the Act of the General Assembly in such cases made and provided, and against the peace and dignity of the Commonwealth of Pennsylvania."

The indictment is based upon sec. 601 of the Criminal Code of June 24, 1939, P. L. 872, 18 PS §4601, which declares all lotteries, public or private, to be common nuisances, and provides that:

"Whoever, either publicly or privately, erects, sets up, opens, makes or draws any lottery, or is in any way concerned in the managing, conducting or carrying on the same, is guilty of a misdemeanor . . ."

The statute does not specifically define the term "lottery". The meaning of that term, however, has been established by the decisions of the courts in many cases. The recognized definitions are thus set forth in the case of Commonwealth v. Banks, 98 Pa. Superior Ct. 432, 435:

"In Com. v. Manderfield, 8 Phila. 457, 459, Judge Paxson defined a lottery to be 'A scheme for the distribution of prizes by chance,' which is practically the same as Webster's definition; and in Com. v. Sheriff, 10 Phila. 203, 204, he said: 'Whatever amounts to this,

no matter how ingeniously the object of it may be concealed, is a lottery.' Worcester defines it: 'A game of hazard in which small sums are ventured for the chance of obtaining a larger value either in money or in other articles.' The Century Dictionary says: 'In law the term "lottery" embraces all schemes for the distribution of prizes by chance, such as policy playing, gift exhibitions, prize concerts, raffles at fairs, etc., and includes various forms of gambling.' In Hull v. Ruggles, 56 N. Y. 424, 427, the Court of Appeals defined it as follows: 'Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to have for it, that is a lottery.' This fits our case exactly; so does the definition in Bishop on Statutory Crimes, Sec. 952 (3d Ed.) : 'A lottery may be defined to be any scheme whereby one, on paying money or other valuable thing to another becomes entitled to receive from him such a return in value or nothing as some formula of chance may determine.' "

"It is universally held that to constitute a lottery there must be present the three elements, of a prize to be won, the determination of the winner by chance, and a consideration:" Commonwealth v. Lund, 142 Pa. Superior Ct. 208, 213.

Our concern, therefore, is to see whether the scheme conducted by defendant may reasonably and fairly be included in the term as commonly used and understood.

Defendant conducted a clothing store in the City of Easton, Northampton County, Pa. He purchased what is styled as the "Pennsylvania Plan" from one, William Weiner, the originator of the plan. Part of the plan was set out in the following posters which were posted in defendant's store and offered in evidence by the Commonwealth as Commonwealth's exhibits nos. 2 and 6:

Exhibit no. 2:

> "YOU MAY JOIN
> THE PENNSYLVANIA PLAN
> TO-DAY AND BE ELIGIBLE
> TO WIN THE BIG PRIZE
> ON SATURDAY NIGHT."

Exhibit no. 6:

"BE ABLE TO BUY WHAT YOU WANT
—WHEN YOU NEED IT!
THE PENNSYLVANIA PLAN
            (Trade Mark)
For Anticipated Budget Accounts
The Easy, Effortless, Automatic Way to
  Accumulate Cash for Purchases

THIS IS HOW IT WORKS
1. You open an account for as little as $1.00—
   to be deposited regularly, every week.
2. You may start any time. You may continue as
   long as you like.
3. You may purchase against your account at any
   time after the first $10 has been paid in.
4. We will lay away, or deliver at your conveni-
   ence, any item you may select, up to the full
   amount of your balance.

BUT THAT'S NOT ALL
  To advertise The Pennsylvania Plan, we are offering
  up to 3 weekly merchandise prizes.

YOU MAY WIN
  One of three merchandise awards. The 'Heavy-
  weight' $50.00; The 'Lightweight' $10.00; The 'Fly-
  weight' $5.00. You don't have to make a purchase,
  nor do you have to open a Pennsylvania Plan account
  to obtain a FREE CHANCE to win.

JUST ASK FOR

A Pennsylvania Plan Courtesy Account Card. If your account number matches the one drawn at the end of the week, you win.

You are cordially invited to attend the weekly drawings—but you do not have to be present to win.

NOTHING TO BUY. No obligation of any kind. Simply register. Participants must be over 18 years of age.

### ANDY'S CLOTHING

359 Ferry Street, Easton, Pa.          Phone 2-5501

Suits—Topcoats—Pants

Copyrights 1950 The Pennsylvania Plan, Forest Hills, N. Y."

To operate the plan defendant kept in his clothing store a box of 1,000 green cards numbered from 000 to 999, and a box of 1,000 grey cards similarly numbered. These were treated as "budget account" cards. To obtain a green card the customer was required to deposit $1, and if he made deposits totalling $52 he was entitled to a suit of clothes or other merchandise to the extent of $52. The plan was to run for 52 weeks and contemplated 52 $1 weekly deposits. This is indicated by the fact that the cards contained 52 printed blocks numbered consecutively from 1 to 52. As deposits or payments were made both the green and the grey cards were punched in the appropriate blocks to indicate the number of $1 deposits. The green cards were given to the customers and held by them as a receipt for their deposits. The grey cards correspondingly punched were kept by defendant as his record of customer-deposits. The holders of green cards were entitled to participate in each weekly drawing, provided they had made the deposit of $1 for the particular week in which the drawing was held. The plan also embodied the issuance of "courtesy account" cards.

"Courtesy account" cards were kept on the counter of defendant's store and were given, *without charge*, to anyone who came into the store and requested them. The "courtesy account" cards were numbered as they were given out and only those numbers which had not been given to green card holders (budget-customers) were available to those who requested "courtesy account" cards. The holders of "courtesy account" cards were permitted to participate in each weekly drawing for which they had obtained a "courtesy account" card. As already stated, the holder of a green card (budget-customer) could participate in each weekly drawing provided the deposit of $1 had been made for the particular week in which the drawing was held. If the holder of a green card failed to make a deposit in any one week he could still participate in the drawing for that particular week by going into defendant's store and procuring a "courtesy account" card. This part of the plan was called "reregistering". If the holder of a green card "reregistered" in this manner, his "courtesy account" card was given the same number as his green card. Neither the holders of green cards nor the holders of "courtesy account" cards had to be present to win a prize. Three weekly prizes were offered: "The 'Heavyweight' $50; The 'Lightweight' $10.00; The 'Flyweight' $5.00."

Defendant conducted his first drawing on February 17, 1951. Thirty-eight green cards had been issued to customers who had made deposits and six "courtesy account" cards had been issued to the individuals requesting them. The drawing for prizes was conducted as follows: A box with balls numbered P0 through P9 were shaken and out of it was drawn a numbered ball. The first ball was P7 and the number seven became the first digit of the winning three-digit number. The second ball drawn was number six and the third ball was number five, making the winning account

number for the first prize number 765. In a similar fashion numbers were drawn to determine the second and third prize winners. There were no prize winners at the drawing because the numbers drawn did not happen to be held by either a green card holder or a "courtesy account" card holder.

In the present case it is conceded that the elements of prize and chance are present. It is contended by defendant, however, that the element of consideration is lacking and that therefore the drawing as operated by defendant does not constitute a lottery.

The decisions in the various jurisdictions present two types of schemes in cases of this kind. One is commonly referred to as the "closed participation" scheme and the other as the "flexible participation" scheme. In the "closed participation" scheme a payment must be made in order that the customer may be assigned a number which is drawn by chance or lot in some manner. In the so-called "flexible participation" scheme some sort of method is employed by means of which persons get chances to win without paying.

It is universally held that a drawing conducted upon the basis of a "closed participation" is a lottery. In such a scheme the purchase or deposit, and the fact that one cannot contend for the prize unless he has made a deposit, establishes the fact of consideration: Commonwealth v. Lund, 142 Pa. Superior Ct. 208, 217, and cases cited therein. In the instant case the element of flexibility was introduced by allowing the holders of "courtesy account" cards to participate in the weekly drawings without payment.

In some jurisdictions it is held that if persons might win a prize without paying for a chance, the practice does not constitute a lottery: Yellowstone-Kit v. State, 88 Ala. 196, 7 So. 338; State v. Eames, 87 N. H. 477, 183 Atl. 590; People v. Cardas, 28 P. (2d) 99 (California); Cross et al. v. People, 18 Colo. 321, 32 Pac.

821; People v. Mail and Express Co., 179 N. Y. S. 640; State v. Hundling 220 Iowa 1369, 264 N. W. 608; City of Roswell v. Jones et al. 41 N. M. 258, 67 P. (2d) 286. These cases proceed on the principle that the element of gaming is wanting to constitute the transaction a lottery, because of the fact that no money was paid directly or indirectly for the chance of receiving a prize or participating in the distribution by lot. These decisions hold that whether a particular scheme is to be regarded as a lottery or otherwise is to be determined by ascertaining whether anyone may possibly win a prize through the operation of the scheme without having paid for the chance to win.

The Superior Court of Pennsylvania has refused to adopt the principles enunciated in the aforementioned cases. In Commonwealth v. Lund, supra, at pages 222 and 223, the Superior Court approved the following language of President Judge Reader of Beaver County:

"After a careful study of many of the decided cases, we are of the opinion that the conclusion stated in the cases hereinbefore considered is not sound. We think the courts have erred in their approach to the real question involved. Our statute, and apparently most of the statutes prohibiting lotteries, are directed against the person or persons establishing, organizing, or conducting a lottery. Our own statute begins by declaring all lotteries, public or private, to be common nuisances. It is this general and public effect of the system which brings it under condemnation. This is because of the tendency of such systems and practices to inflame the gambling instinct, and to corrupt public morals. The primary question in these 'bank night' cases is not whether any individual attending a theatre on 'bank night,' paying for admission, or admitted free, present in person or by proxy, is acting in concert with the owner in operating a lottery, but rather whether

444

the owner is maintaining and operating a lottery. This is to be determined by the character and practical operation of the scheme as a whole, and not by rare instances of departure from the general scheme and practice. The general character of the system is not to be determined by splitting it up into individual contracts between the theatre owner and his patrons. This theory applied in the cases hereinbefore considered is a misleading one, since it diverts attention from the general public effect of the practice which is the evil the law seeks to prevent. It is an impractical one in that it would render extremely difficult, if not impossible, the control of the practice, though manifestly a public nuisance in its operation and effect, by permitting a few exceptional instances of free admissions and free chances to afford immunity to the whole. For it must be observed that in order to render effective this defense based on free admissions, such admissions however few must be held to legalize the entire system. Otherwise the defendants in these cases would always in fact be guilty, for in the case before us, as in every case which has come to our attention, the overwhelming majority of the attendants at the theatre on 'bank night' are there by reason of paid admissions."

This pronouncement of the Superior Court of Pennsylvania is a decisive and complete repudiation of defendant's contention. It definitely brands defendant's scheme a lottery under Pennsylvania law. We, therefore, hold that the sixth, seventh, eighth and ninth reasons assigned by defendant in support of his motion for a new trial are without merit.

The learned assistant district attorney in the brief submitted on behalf of the Commonwealth has unmasked the present scheme for what it is by pointing out that, "If all the tickets were sold that were in the box of budget plan tickets, there would be 1,000 plan customers paying at least $1 per week, or a total of

$1,000 per week which, when multiplied by the 52 payments called for by the budget plan card, would amount to a payment of $52,000 by the end of the year. From the $1,000 to be paid weekly, presuming there were winners each week, the prizes would total $65 in merchandise, which is not the equivalent of even $65 in cash. Of course, defendant-operator could afford $65 in merchandise upon taking $1,000 in cash weekly; of course, he could afford to award a suit to each one of the budget plan customers who paid out $52 at the end of each year. And, this does not take into account the created traffic in this store, further affording the opportunity to defendant for greater gains in the hope that those who were paying the $1 per week would in addition be buying more merchandise in this store."

The remaining reasons assigned in support of defendant's motion for a new trial will be separately considered.

Reason no. 1: "All the evidence submitted by the Commonwealth was at variance with the charge of a 'suit club' in the indictment."

The recital of the facts in the beginning of this opinion conclusively shows that the evidence submitted by the Commonwealth was *not* at variance with the charge of a "suit club" but entirely consistent with such charge.

Reason no. 2: "The Commonwealth did not offer any evidence to explain what a 'suit club' is; and defendant was not permitted to offer the testimony of William Weiner to explain the differences between what is commonly known as a 'suit club' and the 'Pennsylvania Plan'."

William Weiner, the originator of the so-called "Pennsylvania Plan", was called as a witness by defendant. The Commonwealth asked for an offer of proof, whereupon the following offer was made by

counsel for defendant: "I am going to prove through this witness, Your Honor, how this plan actually works, to clear up the innuendos and inferences created by the assistant district attorney and his witnesses in this matter. This man is the creator of this plan, and he knows the very interstices of this plan. He knows the very workings of this plan. He is going to show how this plan operates." The Commonwealth objected to the offer on the ground that the proferred testimony was irrelevant. The court sustained the objection, stating: "We are interested in what went on in this place, no other place." Counsel for defendant noted an exception to the court's ruling and then offered "to prove through Mr. Weiner how the plan was operated by Andrew Cusano and what orders were given to Mr. Cusano in the operation of this plan." The court sustained the Commonwealth's objection to this offer, stating: "Orders given by somebody else wouldn't make any difference at all. The question is: Were they carried out?" Without taking an exception to the ruling, defense counsel then made the following offer of proof: "I intend to prove through this man that he was there many times in the operation of this plan and that he saw the thing in operation." The record reveals the following action with respect to this offer of proof:

"The Court: Any objection to that?

"Mr. Weitzman: I object to it, Your Honor.

"The Court: For what reason?

"Mr. Weitzman: For the reason it doesn't relate to the Commonwealth's case. . . .

"The Court: He was an eye witness as to how it operated?

"Mr. Cericola: *I think so; I'm not sure.* . . .

"The Court: You better find out whether you can prove that or not. You are representing to the court that you will.

"Mr. Cericola: Well, then let's withdraw him, and I will put Andy Cusano on at this time. I'll talk to him later.

"The Court: All right."

Defense counsel then withdrew Mr. Weiner as a witness and called defendant Andrew Cusano. Defense counsel did not recall Mr. Weiner at any subsequent stage of the proceedings.

It is apparent that defense counsel called Mr. Weiner for the purpose of explaining the provisions of the "Pennsylvania Plan" as he, Mr. Weiner, would portray the plan. The objection to Mr. Weiner's testimony was that the only matter before the court was defendant's method of operating the plan and not how Mr. Weiner could have refined or corrected defendant's method of operation. When the trial court questioned defense counsel as to whether Mr. Weiner was an eye witness as to how the plan was operated in the defendant's clothing store, defense counsel withdrew Mr. Weiner to find out whether or not he was an eye witness and could testify as to matters within his own knowledge. Defense counsel did not later recall this witness, leaving the inference that the witness Weiner had no eye-witness testimony to present as to the operation of the plan by defendant.

Under the circumstances, we find no error in the trial court's rulings.

Reason no. 3: "The court erred in refusing point no. two of the points for charge as follows: 'If, after consideration of all the evidence presented in this case, a reasonable doubt exists in the minds of the jurors that the Pennsylvania Plan was or was not a "suit club", then the defendant should be acquitted.' "

The trial court properly refused to affirm this point. It is so vague and indefinite as to be incomprehensive. Whether or not the so-called "Pennsylvania Plan" was a "suit club" was not the question involved. The plan

or scheme might be given any name. The crucial question was whether or not the plan or scheme as operated by defendant constituted a "lottery" under the law.

The refusal of this point could not possibly have prejudiced defendant in view of the fact that the trial court had covered defendant's contentions fully and adequately not only in the charge itself but in affirming the remaining points for charge submitted by defendant. Defendant's points for charge and the rulings thereon made by the trial court are hereinafter fully quoted.

Reason no. 4: "The court erred in its charge to the jury and in its additional instructions to the jury the details of which errors will be further set forth in a supplemental motion, as soon as defendant has a written copy of the notes of testimony and the charge of the court."

The supplemental motion detailing alleged errors in the charge, contemplated by defendant, was never filed. To date we have not been apprised of the nature of defendant's complaints respecting the charge of the trial court. We have carefully examined the charge of the trial court. It follows closely the law as laid down in Commonwealth v. Lund, supra, and is without error. We note also that the trial court went out of its way to place all of defendant's contentions before the jury by affirming and reading to the jury defendant's points for charge, as follows:

"Point number 1 is affirmed. The court has already so instructed you. 'If, after a consideration of all the evidence presented in the case, a reasonable doubt exists in the minds of the jurors as to the innocence or guilt of the defendants, the defendants are entitled to the benefit of this doubt and should be acquitted.' The court has already so instructed you, and the point is affirmed.

"The second point is refused and not read, as not in keeping with the facts.

"Point 3 is affirmed as follows: 'There must be present three elements: A prize to be won, the determination of the winner by chance, and a consideration for the prize to be won.' The court has already instructed you exactly along that line.

"Point 4 is affirmed and reads as follows: 'If the Jury believes that the Pennsylvania Plan gave a customer or stranger the right to a chance for a prize so long as he registered either as the holder of a budget account or as the holder of a courtesy account and that the plan as advertised and as explained to the customer or stranger required no consideration from the participant in any form whatever, the Pennsylvania Plan is not an illegal lottery, and you must acquit the defendants.' That is affirmed.

"Point 5 is also affirmed and reads as follows: "If you find that the Pennsylvania Plan did not obligate a participant to buy a suit or other merchandise and was primarily a savings plan for the convenience of the customer, with an independent and separate chance to get a prize offered to holders of either budget account cards for any week during which the plan was in existence or a courtesy account card for that particular week, then you must acquit the defendants of the crime as charged in the indictment.' I have already so charged you.

"Point 6 is affirmed and reads as follows: 'If the jury believes that the budget account plan conducted by the defendants is independent and separate from the chance for a prize and that the chance for a prize is free to anyone who would register at defendants' store, without any forbearance or loss on the part of the participant, the drawing is not an illegal lottery, and you must acquit the defendants.' That point is

affirmed. The court has already charged you along that line.

"Point 7 reads as follows: 'If the jury finds that the plan operated by the defendants consists of two features, namely: (1) A free drawing, and (2) a savings plan, and if you find further that the drawing was free to all on the same basis, without cost or consideration, independently of the savings plan, then the drawing was not an unlawful one, and you must acquit the defendants.' That point is affirmed, and the court has already so instructed you. If the plans were separate and distinct and had no bearing upon each other, as I have already instructed you, then of course there would be nothing illegal about it. If, on the other hand, they were bound up together, then the giving of free tickets would make no difference; it would still be a lottery under the law. I have already gone into that rather fully with you in my prior charge."

In reason no. 4, supra, defendant also asserts that the trial court "erred . . . in its additional instructions to the jury," but again the specific errors complained of are not set forth. In these circumstances we might well dismiss defendant's complaint against the additional instructions as violative of Northampton County Court Rule 165, which provides that, "In motions for a new trial . . . specific and particular reasons shall be assigned; general reasons will not be considered." However, since we are dealing with a criminal offense, we will consider defendant's complaints relative to the additional instructions raised for the first time when the case was argued before the court en banc.

The additional instructions complained of are embodied in the following excerpts from the record:

"The Court: I understand you desire further instructions. I don't want to know where you stand, and just state what further instructions you desire. Is it true that you want further instructions?

"A Juror: That's true. I'm not the foreman, but that's the foreman at the other end.

"The Foreman: We wanted instructions as regards to what constitutes a lottery.

"The Court: I went into that very fully.

"The Foreman: That's what I thought.

"The Court: You will recall that I instructed you that there were three elements necessary to constitute a lottery. I don't know whether that is your problem or not, but I will start there. There must be a scheme which contains three elements. The three elements are: First, a prize to be awarded; the second element is the determination of the winner by chance; the third element is that there must be consideration. The act of assembly bearing on the subject reads as follows: Whoever, either publicly or privately, erects, sets up, opens, makes, or draws a lottery or is in any way concerned in the managing, conducting, or carrying on of the same is guilty of a misdemeanor. A lottery has been defined in the law—and it is the common definition of a lottery—as a scheme by which on one's paying money or some other thing of value he obtains a contingent right to have something of greater value if an appeal to chance by lot or otherwise under the direction of the manager of the scheme should decide in his favor. In order to have a lottery, there must be a prize offered, there must be a drawing by chance or by lot, and there must be a consideration paid. Does that answer your question or clarify the situation for you? If not, do you wish me to define the term further?

"The Foreman: That clears it up with me. There are some others that want it cleared up further. Is there anyone that isn't clear?

"A Juror: But the consideration must be paid for the chance: Is that right?

"The Court: There must be consideration paid, and consideration may be $1 or other valuable thing. In

this particular case one of the contentions is that because there were free chances given, that took it out of the class of lottery as defined in the act of assembly. I instructed you fully with respect to that situation. ...

"A Juror: But that dollar was for merchandise, wasn't it, in the store.

"The Court: The dollar was paid in and could be used to buy merchandise. That, however, would make no difference.

"Mr. Weitzman: Mr. Cericola, stand back, will you please?

"Mr. Cericola: That's all right. I'm not interfering with you, George.

"Mr. Weitzman: No, but you are nodding to the jurors.

"The Court (To the jury): That would make no difference. It would still be a lottery if the primary purpose were to get the customer to pay that dollar by having these drawings every week; it would make no difference that they got merchandise with it or for it."

Defendant contends that the trial court did not answer the juror's question, viz.: "But the consideration must be paid for the chance: Is that right?" We are satisfied that the trial court answered this question fully and adequately by stating that, "There must be consideration paid, and consideration may be $1 or other valuable thing." Furthermore, this question had been answered in the main charge and also in the additional instructions when the court specifically defined the term "lottery" and outlined the three essential elements of the offense.

Counsel for defendant also singled out for objection the court's answer to the juror's question: "But that dollar was for merchandise, wasn't it, in the store?" The court answered: "The dollar was paid in and could be used to buy merchandise. That, however, would

make no difference." Before the court could complete its answer, the court was interrupted by counsel. After the interruption, the court continued: "That would make no difference. It would still be a lottery if the primary purpose were to get the customer to pay that dollar by having these drawings every week; it would make no difference that they got merchandise with it or for it."

It is apparent from a reading of the complete answer of the trial court that no error was committed.

Reason no. 5: "The court erred in admitting certain evidence over the objections of defendant's attorneys and refusing to admit certain evidence offered by defendant, the details of which errors will be further set forth in a supplemental motion, as soon as defendant has a written copy of the notes of testimony and the charge of the court."

The specific errors complained of in this assignment have never been set forth since no supplemental motion for a new trial was filed. In these circumstances there is nothing before us for consideration. Furthermore, this assignment of error violates Northampton County Court Rule 165 which requires the statement of specific and particular reasons.

Upon argument of the motion before the court en banc, defense counsel for the first time complained that "the trial as a whole was conducted in such a manner as to indicate that the trial judge was prejudiced in favor of the Commonwealth and against the defendants. The trial judge personally examined the witnesses as though he were the Commonwealth's attorney, often making comments such as 'I don't understand that'. Furthermore, much greater latitude was given to the assistant district attorney than to the defense attorneys."

No complaint of this kind was made in the written motion for a new trial. It now comes as an after-

thought and is utterly without foundation. In the everlasting search for truth, the court is entirely within its province in examining the witnesses. This has been the custom in our courts because it is necessary that the court and jury understand the witnesses. In fact, it is the court's duty to see that all of the facts are presented to the jury. An examination of the record will reveal that the questions asked by the trial court were designed to assist the jury, and that many of them actually assisted defendant in the presentation of his case. Greater latitude was given to defense counsel in the presentation of their case than was given to Commonwealth's counsel. The charge of the court as a whole was more favorable to defendant than to the Commonwealth. The trial court studiously avoided giving any indication as to its opinion of the evidence. The trial court specifically charged the jury:

"You are the sole judges of the facts, not the court. You are the sole judges of the credibility of the witnesses. I will not attempt to invade that province at all, and I do not want you to get the notion from anything that the court says that the court has formed an opinion as to what your verdict in this case should be. That is not my province; that is your especial function, to determine the guilt or innocence of these defendants."

The trial court left to the jury the resolving of all questions of fact. Time and again the court charged the jury that it was the duty of the jury to find the real purpose of the plan and how it operated. At the conclusion of the charge, the trial court stated to defense counsel:

"Well, now, you state what that contention is, and I will place it before the jury, because I want to be sure that I have placed every one of defendants' contentions before the jury." All of defendant's points for charge hereinabove fully quoted, with the exception of point

no. 2, were read to the jury. All of them strongly pressed defendant's contentions that the plan or scheme operated by defendant was not an illegal lottery.

It is our considered judgment that defendant was accorded a fair trial, that the charge of the trial court was completely unbiased, fully adequate and comprehensive both as to the law and the facts, and that under the law and the evidence the jury was justified in convicting defendant, Andrew Cusano, of setting up and maintaining a lottery contrary to law.

### Order

And now, August 6, 1951, defendant's motion for a new trial is denied and rule therefor discharged. The district attorney is hereby directed to call defendant, Andrew Cusano, for sentence on September 10, 1951.