**NATIONAL FOOTBALL LEAGUE, an unincorporated association, and its twenty-eight constituent member clubs, to wit, et al., Plaintiffs,**

v.

**GOVERNOR OF the STATE OF DELAWARE, et al., Defendants.**

Civ. A. No. 76–273.

United States District Court, D. of Delaware.

Aug. 11, 1977.

E. Norman Veasey, Richard J. Abrams, Roderick R. McKelvie and Thomas L. Ambro of Richards, Layton & Finger, Wilmington, Del., Townley & Updike, New York City, for plaintiffs.

James M. Mulligan, Jr., Andrew G. T. Moore, II, and James S. Green of Connolly, Bove & Lodge, Richard R. Wier, Jr., Atty. Gen. of State of Del., Wilmington, Del., for defendants.

## OPINION

STAPLETON, District Judge:

In August 1976, the Office of the Delaware State Lottery announced a plan to institute a lottery game based on games of the National Football League ("NFL"). Immediately thereafter, the NFL and its twenty-eight member clubs filed suit in this Court against the Governor and the Director of the State Lottery seeking preliminary and permanent injunctive relief barring such a lottery scheme. The State of Delaware intervened, and the complaint was amended to add a request that the Court create a constructive trust on behalf of the NFL clubs of all revenues derived from such a lottery. Finding no threat of immediate irreparable injury to the NFL, the Court denied the prayer for a temporary restraining order.[1]

During the week of September 12, 1976, the football lottery games commenced. Upon defendants' motion, the Court dismissed plaintiffs' claims that the games violated the Equal Protection Clause of the Fourteenth Amendment and the Commerce Clause of the Constitution. With respect to twelve other counts, defendants' motion to dismiss or for summary judgment was denied. The lottery games continued through the season.

---

1. At this early stage, the Court requested the views of the parties as to whether it should consider abstaining in this case. All parties, including the State, requested that the Court not abstain.

In late Fall, a six day trial on the merits was held. That was followed by extended briefing. The matter is now ripe for disposition. This Opinion constitutes the Court's findings of fact and conclusions of law on the questions presented.

## FACTUAL BACKGROUND

The Delaware football lottery is known as "Scoreboard" and it involves three different games, "Football Bonus", "Touchdown" and "Touchdown II". All are weekly games based on regularly scheduled NFL games. In Football Bonus, the fourteen games scheduled for a given weekend are divided into two pools of seven games each. A player must mark the lottery ticket with his or her projections of the winners of the seven games in one or both of the two pools and place a bet of $1, $2, $3, $5 or $10. To win Football Bonus, the player must correctly select the winner of each of the games in a pool. If the player correctly selects the winners of all games in both pools, he or she wins an "All Game Bonus". The amounts of the prizes awarded are determined on a pari-mutuel basis, that is, as a function of the total amount of money bet by all players.

In Touchdown, the lottery card lists the fourteen games for a given week along with three ranges of possible point spreads. The player must select both the winning team and the winning margin in each of three, four or five games. The scale of possible bets is the same as in Bonus and prizes are likewise distributed on a pari-mutuel basis to those who make correct selections for each game on which they bet.

Touchdown II, the third Scoreboard game, was introduced in mid-season and replaced Touchdown for the remainder of the season. In Touchdown II, a "line" or predicted point spread on each of twelve games is published on the Wednesday prior to the games. The player considers the published point spread and selects a team to "beat the line", that is, to do better in the game than the stated point spread. To win, the player must choose correctly with respect to each of from four to twelve games.

Depending upon the number of games bet on, there is a fixed payoff of from $10 to $1,200. There is also a consolation prize for those who beat the line on nine out ten, ten out of eleven or eleven out of twelve games.

Scoreboard tickets are available from duly authorized agents of the Delaware State Lottery, usually merchants located throughout the State. The tickets list the teams by city names, e. g., Tampa or Cincinnati, rather than by nicknames such as Buccaneers or Bengals. Revenues are said to be distributed pursuant to a fixed apportionment schedule among the players of Scoreboard, the State, the sales agents and the Lottery Office for its administrative expenses.

## THE PARTIES' CLAIMS

The core of plaintiffs' objections to Scoreboard is what they term a "forced association with gambling". They complain that the football lottery constitutes an unlawful interference with their property rights and they oppose its operation on a host of federal, state and common law grounds. Briefly stated, their complaint includes counts based on federal and state trademark laws, the common law doctrine of misappropriation, the federal anti-gambling laws, the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Delaware Constitution and the Delaware lottery statute.

The defendants deny that the state-run revenue raising scheme violates any federal, state or common law doctrine. Further, they have filed a counterclaim for treble damages under the Sherman and Clayton Acts for federal antitrust law violations charging, *inter alia*, that the plaintiffs have brought this litigation for purposes of harassment and that they have conspired to monopolize property which is in the public domain.

For the reasons which follow, I have determined that the plaintiffs are entitled to limited injunctive relief, in the nature of a disclaimer on all Scoreboard materials disseminated to the public. The Touchdown II

game will also be invalidated. In all other respects, their claims for relief are denied. The defendants' claim for treble damages is likewise denied.

## I. MISAPPROPRIATION

Plaintiffs have proven that they have invested time, effort, talent and vast sums of money in the organization, development and promotion of the National Football League. They have also convincingly demonstrated the success of that investment. The NFL is now a national institution which enjoys great popularity and a reputation for integrity. It generates substantial revenue from gate receipts, broadcasting rights, film rights, and the licensing of its trademarks.

There also can be no dispute that the NFL popularity and reputation played a major role in defendants' choice of NFL games as the subject matter of its lottery. Defendants concede that in making this election they expected to generate revenue which would not be generated from betting on a less popular pastime.

Based on these facts, plaintiffs assert that defendants are misappropriating the product of plaintiffs' efforts—or in the words of the Supreme Court, that the State of Delaware is "endeavoring to reap where it has not sown". *International News Service v. Associated Press*, 248 U.S. 215, 239, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918) ("*INS*"). Thus, plaintiffs maintain the lottery must be halted and the ill-gotten gains disgorged.

This Court has no doubt about the continuing vitality of the *INS* case and the doctrine of misappropriation which it spawned.[2] I conclude, however, that plaintiffs' argument paints with too broad a brush.

■ The only tangible product of plaintiffs' labor which defendants utilize in the Delaware Lottery are the schedule of NFL games and the scores. These are obtained from public sources and are utilized only after plaintiffs have disseminated them at large and no longer have any expectation of generating revenue from further dissemination. This fact distinguishes the situation in *INS*.[3] In that case the Court recognized the right of INS to protection against misappropriation of the news it had collected for so long as that "product" still retained commercial value to AP. The court was careful to note that the injunction issued by the District Court limited the protection granted only until the time when "[the] commercial value as news to . . . [AP] and all of its . . . [customers had] passed away". 248 U.S., at 245, 39 S.Ct., at 75. I do not believe the *INS* case or any other case suggests use of information that another has voluntarily made available to the public at large is an actionable "misappropriation".

Plaintiffs insist, however, that defendants are using more than the schedules and scores to generate revenue for the State. They define their "product" as being the total "end result" of their labors, including the public interest which has been generated.

---

**2.** The misappropriation doctrine suffered a setback in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), cases in which the Supreme Court held that state unfair competition laws cannot forbid the copying of unpatentable or unpatented articles. Some commentators speculated that these holdings signaled the demise of the misappropriation doctrine. *See, e. g.,* 2 *Callman, Unfair Competition, Trademarks and Monopolies* § 60.4(c) (3rd ed. 1968). However, recent developments have indicated that the doctrine continues to have vitality. *Zacchini v. Scripps-Howard Broadcasting Co.*, —— U.S. ——, 97

S.Ct. 2849, 53 L.Ed.2d 965 (June 28, 1977); *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); *DeCosta v. Columbia Broadcasting System, Inc.*, 520 F.2d 499, 510 (1st Cir. 1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976).

**3.** On this same ground, the case can be distinguished from *Zacchini v. Scripps-Howard Broadcasting Co., supra. Zacchini* upheld a performer's right of publicity in "an entire act that he ordinarily gets paid to perform". —— U.S., at ——, n. 9, 97 S.Ct. at 2856. The Delaware Scoreboard Lottery is not appropriating the very performances from which the NFL derives its earnings.

It is undoubtedly true that defendants seek to profit from the popularity of NFL football. The question, however, is whether this constitutes wrongful misappropriation. I think not.

We live in an age of economic and social interdependence. The NFL undoubtedly would not be in the position it is today if college football and the fan interest that it generated had not preceded the NFL's organization. To that degree it has benefited from the labor of others. The same, of course, can be said for the mass media networks which the labor of others have developed.

What the Delaware Lottery has done is to offer a service to that portion of plaintiffs' following who wish to bet on NFL games. It is true that Delaware is thus making profits it would not make but for the existence of the NFL, but I find this difficult to distinguish from the multitude of charter bus companies who generate profit from servicing those of plaintiffs' fans who want to go to the stadium or, indeed, the sidewalk popcorn salesman who services the crowd as it surges towards the gate.

While courts have recognized that one has a right to one's own harvest, this proposition has not been construed to preclude others from profiting from demands for collateral services generated by the success of one's business venture. General Motors' cars, for example, enjoy significant popularity and seat cover manufacturers profit from that popularity by making covers to fit General Motors' seats. The same relationship exists between hot dog producers and the bakers of hot dog rolls. But in neither instance, I believe, could it be successfully contended that an actionable misappropriation occurs.

■ The NFL plaintiffs, however, argue that this case is different because the evidence is said to show "misappropriation" of plaintiffs' "good will" and "reputation" as well as its "popularity". To a large extent, plaintiffs' references to "good will" and "reputation" are simply other ways of stating their complaint that defendants are profiting from a demand plaintiffs' games have generated. To the extent they relate to a claim that defendants' activities have damaged, as opposed to appropriated, plaintiff's good will and reputation, I believe one must look to other lines of authority to determine defendants' culpability.[4] In response to plaintiffs' misappropriation argument, I hold only that defendants' use of the NFL schedules, scores and public popularity in the Delaware Lottery does not constitute a misappropriation of plaintiffs' property.

In the event a differing analysis is determined to be appropriate in the course of appellate review, I should add that the plaintiffs have not demonstrated that the existence of gambling on its games, per se, has or will damage its good will or reputation for integrity. By this, I do not suggest that an association of the NFL with a gambling enterprise in the minds of the public would not have a deleterious effect on its business. Such an association presupposes public perception of NFL sponsorship or approval of a gambling enterprise or at least confusion on this score, and I treat this subject hereafter. I do find, however, that the existence of gambling on NFL games, unaccompanied by any confusion with respect to sponsorship, has not injured the NFL and there is no reason to believe it will do so in the future. The record shows that extensive gambling on NFL games has existed for many years and that this fact of common public knowledge has not injured plaintiffs or their reputation.

The most prevalent form of such gambling is the illegal form—office polls and head-to-head bets with bookies. Virtually every witness testified that he was familiar with illegal football pools and knew they were available in schools, factories and offices around the country. John J. Danahy, Director of Security for the NFL and a former member of the Federal Bureau of Investigation, estimated that millions of dollars a week are spent for illegal betting

4. See Section II, *infra.*

on football games and that such gambling provides a major source of income to organized crime.[5]

In addition to the illegal gambling, the evidence shows that there is a substantial volume of legalized sports betting. In Nevada, sports betting, including betting on NFL games, has been legal since 1949. The parties have stipulated that sports betting in Nevada in the fourth quarter of the year, when the betting is primarily on football games, has reached the following levels:[6]

| 1972 | $    873,318 |
| 1973 | $    826,767 |
| 1974 | $ 3,873,217 |
| 1975 | $26,170,328 |

These figures represent both "by event" or "head-to-head" betting and parlay card betting. In addition, pool card gambling on professional football has been legal in Montana since 1974. The NFL has not shown that any of this gambling, legal or illegal, has injured the reputation of professional football or the member teams of the NFL.

Some comment on the plaintiffs' survey evidence on this subject is in order. A market survey was conducted at the direction of the plaintiffs for use in this litigation. One of the questions asked of those surveyed was:

Suppose there would be legalized betting on National Football League games which was run by a state agency in each of the various states. Do you think that the reputation of the National Football League would be better, stay the same or be worse than before legalized betting?

Those who responded that they thought the NFL's reputation would decline were asked in a follow-up question to explain why they thought so. Fifty percent of those responding in the "National" portion of the survey said that they believed the NFL's reputation would be hurt. Those who conducted the survey broke down the

reasons given for that belief into four separate categories:

| 26% | Will mean more crime |
| 29% | Opposed to betting |
| 19% | Throwing or fixing game |
| 30% | Takes sportsmanship out of the game |

While these results do suggest that gambling on NFL games would adversely affect the NFL, there are several reasons why I cannot credit the data. Most importantly, there is the overwhelming evidence already reviewed that, in actual experience, widespread gambling, both illegal and state-authorized, has not hurt the NFL. That evidence is far more persuasive than survey results based on hypothetical questions.[7]

In addition, there are a number of problems with the form of question used in the survey. It asks the person responding, not whether he or she would think less of the NFL, but rather whether he or she thinks *others* would have less regard for the NFL. The response is by nature speculation and it is quite conceivable that many who would have no objection to state-run sports betting would assume that others would hold a different view. The question as asked did not elicit relevant information.

Moreover, the question assumed that every state would institute such a program. While it has been suggested that a few other states are considering football lotteries, I have no reason to believe that the Delaware scheme will be imitated by forty-nine other states. In any event, the issue before this Court is whether Delaware's Scoreboard games will injure the NFL's reputation. The question asked in the "national" survey addressed a far broader subject which the plaintiffs have not shown to be relevant.

Finally, the phrasing of the question did not emphasize a proposed system run inde-

---

**5.** T. B–142–43.

**6.** DX 41, ¶ 6.

**7.** The survey itself bears out the conclusion that those with actual experience with state-run sports betting have far different views than those who are dealing with the question in the abstract. When Delawareans were asked whether the State's football lottery would injure the reputation of the NFL only 22% answered affirmatively. PX 69, at 21.

pendently of the NFL. As will be seen,[8] that may have influenced some responses.

## II. TRADEMARK AND RELATED UNFAIR COMPETITION CLAIMS

The Delaware Lottery does not utilize the NFL name or any of plaintiffs' registered service marks for the purpose of *identifying*, as opposed to *describing*, the service which it offers. The name utilized for the football related betting games is "Scoreboard" and the individual games are identified as "Football Bonus", "Touchdown" and "Touchdown II". No NFL insignia or the like are utilized in the advertising. The cards on which the customers of the Delaware Lottery mark their betting choices, however, identify the next week's NFL football games by the names of the cities whose NFL teams are scheduled to compete against each other, *e. g., Philadelphia v. Los Angeles, Washington v. Baltimore, etc.* It is stipulated that, in the context in which they appear, these geographic names are intended to refer to, and are understood to refer to, plaintiffs' football teams. It is in this manner that defendants have made it known that the Delaware Lottery offers the opportunity to bet on NFL football.

Undoubtedly when defendants print "*Philadelphia v. Los Angeles*", the public reads "*Philadelphia Eagles v. Los Angeles Rams*", and, in this sense, the words utilized by defendants have a secondary meaning. But I do not understand this fact alone to constitute infringement of plaintiffs' registered marks or unfair competition. Defendants may truthfully tell the public

what service they perform,[9] just as a specialist in the repair of Volkswagen cars may tell the public of his specialty by using the word "Volkswagen",[10] and just as the manufacturer of a razor blade may advertise the brand names of the razors they will fit.[11] The same rule prevails in the area of comparative advertising which utilizes the tradenames of competing products.[12]

■ What one may not do, however, is to advertise one's services in a manner which creates an impression in the mind of the relevant segment of the public that a connection exists between the services offered and the holder of the registered mark when no such connection exists.[13] Moreover, this legal prohibition imposes a duty to take affirmative steps to avoid a mistaken impression which is likely to arise from a truthful description of the service even though it does not literally suggest a connection.[14]

■ This case presents a novel situation for application of these well established principles. After carefully reading all of the materials disseminated in connection with the Delaware Lottery, I cannot point to any specific statement, symbol, or word usage which tends to suggest NFL sponsorship or approval. At the same time, however, plaintiffs have convinced me that a substantial portion of the present and potential audience for NFL games believes that the Delaware Lottery is sponsored or approved by the NFL.

In what is denominated the "Delaware Special" portion of the market survey re-

---

**8.** *Infra*, at 1380–1381.

**9.** *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924).

**10.** *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969); McCarthy, *Trademarks and Unfair Competition* § 25:12 (1973) (hereinafter cited as *McCarthy*).

**11.** *American Safety Razor Corp. v. International Safety Razor Corp.*, 26 F.2d 108, *rev'd on other grounds*, 34 F.2d 445 (3rd Cir. 1929); *McCarthy* § 25:13.

**12.** *Saxony Products, Inc. v. Guerlain, Inc.*, 513 F.2d 716 (9th Cir. 1975); *McCarthy* § 25:14.

**13.** Section 43(a), 15 U.S.C. § 1125(a) (1974); *McCarthy* §§ 25:12–25:14.

**14.** *Potato Chip Institute v. General Mills*, 333 F.Supp. 173, 180–81 (D.Neb.1971) 461 F.2d 1088 (8th Cir. 1972). *See also Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968); *Cutler Hammer, Inc. v. Universal Relay*, 285 F.Supp. 636 (S.D.N.Y.1968) (particularly the scope of relief granted).

ferred to above,[15] 19% of the Delaware residents surveyed and 21% of those designated as "fans",[16] either said that, as far as they knew, the legalized betting on professional football was arranged by the State with the authorization of the teams or said that it was conducted by the teams alone. Before answering, some of those questioned were shown a sample lottery ticket and others were not. The results did not vary significantly between the two groups. These figures establish that there is substantial confusion on the part of the public about the source or sponsorship of the lottery.[17]

This Court perceives only one way to reconcile these survey results with the absence of any affirmative suggestion of sponsorship or approval in the Delaware Lottery advertising and materials. Apparently, in this day and age when professional sports teams franchise pennants, teeshirts, helmets, drinking glasses and a wide range of other products, a substantial number of people believe, if not told otherwise, that one cannot conduct an enterprise of this kind without NFL approval.

While defendants are guilty of no affirmative statements suggesting affiliation and may well not have foreseen that a substantial number of people would infer an association with the NFL, the fact remains that the ultimate result of their promotion of the Delaware Lottery is significant public confusion and the loss to the NFL of control of its public image. I conclude that this fact entitles plaintiffs to some relief.

The only monetary relief sought by plaintiffs—a judgment directing transfer of the proceeds of the Lottery to NFL Charities Incorporated—is inappropriate. These proceeds are not funds that the NFL would have harvested for itself in the absence of the Lottery. Nor is there any reason to believe that the retention by the State of any of these proceeds would result in unjust enrichment. I have previously held that Delaware has a right to profit from a demand for gambling created by NFL games. Relief is appropriate only because of the failure of the defendants to avoid an impression of sponsorship, and this record does not suggest that the proceeds of the Lottery were in any way augmented by any public perception of affiliation. Given the nature of the service provided, I strongly suspect that this limited perception had no effect on revenue.

To eliminate the confusion as to sponsorship, an injunction will be entered requiring the Lottery Director to include on Scoreboard tickets, advertising and any other materials prepared for public distribution a clear and conspicuous statement that Scoreboard is not associated with or authorized by the National Football League.[18]

Officials of the Delaware Lottery volunteered early in this litigation to employ such a disclaimer. The NFL was dissatisfied with the proposal and, as a result, the Lottery Office took no steps to adopt it. Scoreboard tickets were inscribed with the statement, "The 'Scoreboard' Lottery is sponsored solely by the Delaware State Lottery". However, this appeared at the very

---

15.  PX 49, at 30–31.

16.  For purposes of the survey, the plaintiffs designated anyone who had ever seen a professional football game live or on television a "fan". Using this definition, 85% of those asked about the source of the lottery qualified as "fans". While I do not think that this definition accords with the commonly accepted notion of who are football fans, I think the NFL cogently argues that its universe of "fans" represents fans and potential fans and, that for purposes of this survey the views of both groups are relevant.

17.  Plaintiffs argue that the 26% of the total population and 19% of "fans" who said that they did not know how the football betting was

arranged also fall within the class confused or likely to be confused as to the source of the betting. I need not accept this argument to conclude that the plaintiffs have established a significant level of confusion in the marketplace.

18.  *Geisel v. Poynter Products, Inc.*, 295 F.Supp. 331, 352 (S.D.N.Y.1968). *See also Champion Plug Co. v. Sanders*, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947); *Prestonettes v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924); *Société Comptoir De l'Industrie Cotonniere Establissements Boussac v. Alexander's Department Store, Inc.*, 299 F.2d 33 (2nd Cir. 1962).

bottom of the back of the tickets and was not included in defendants' advertising and other promotional materials.

The survey indicates that this approach to the problem was not sufficient to dispel the idea that the NFL was somehow associated with the Lottery. That survey does not suggest to the Court, however, that a prominent statement on all Scoreboard materials disclaiming any affiliation would be insufficient to protect plaintiffs' legitimate interests.

## III. DELAWARE TRADEMARK ACT

In a letter memorandum submitted after its initial post-trial brief, plaintiffs added for the first time the contention that Scoreboard violates the newly enacted Delaware Trademark Act, 6 Del.C. § 3301 (60 Del. Laws, Ch. 612). I have no occasion to consider the merits of that contention because the statute, by its very terms, does not apply to this case.

■ The Trademark Act, signed into law by the Governor on July 22, 1976, provides:

This act shall be in force and take effect 1 month after its enactment *but shall not affect any suit, proceeding or appeal then pending.* (Emphasis added).

This lawsuit was filed on August 20, 1976, and thus, was pending when the Act became law. Despite the plain language of the new statute, plaintiffs attempt to bring themselves under its mantle in this lawsuit by arguing that, if they are not permitted to do so, they may institute a new lawsuit raising the same claim. That course of action may indeed be open to them but it does not further their cause in this suit. I cannot disregard the plain command of the statute.

19. The full text of Section 17 reads:
All forms of gambling are prohibited in this State except the following:
(a) Lotteries under State control for the purpose of raising funds,
(b) Wagering or betting on races within the enclosure of any race meeting licensed

## IV. DELAWARE LOTTERY LAW

The plaintiffs assert that the State Lottery Office is acting *ultra vires* in conducting the Scoreboard games. The NFL points to Article II, Section 17 of the Delaware Constitution which prohibits all forms of gambling in the State except lotteries under state control, pari-mutuel wagering on State licensed races, and Bingo.[19] The heart of their contention based on Section 17 is that Scoreboard is not a lottery. The NFL further contends that, even if Scoreboard is a lottery within the meaning of the Constitution, the Lottery Office is operating it in a manner inconsistent with the requirements for state lotteries established by the General Assembly. The State's first line of defense is that the NFL lacks standing to raise these *ultra vires* arguments.

### A. Standing

■ The question of standing with respect to claims based on the State Constitution and a State statute is governed by Delaware law. In the past, the Delaware Supreme Court has looked to and followed the rules of standing established in the federal courts on the law of standing as well as to its own precedents. I have done likewise here.

■ In *Mills v. Trans-Caribbean Airways, Inc.,* 272 A.2d 702, 703 (Del.1971), the court held that standing to attack the constitutionality of a statute or any action taken thereunder depends on a showing that "a right of the complainant is affected thereby". *Association of Data Processing Services Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), sets forth a three-part analysis by which to determine whether such a litigable right exists. *Camp* held that a party must allege injury in fact; he must show that he is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question"; and

and conducted under the laws of this State by the use of pari-mutuel machines or totalizators,
(c) Bingo games as conducted under the limitations of Section 17A.
The General Assembly shall enforce this Section by appropriate legislation.

finally, the complainant must establish that judicial review has not been precluded. 397 U. S. at 152–156, 90 S.Ct. at 830. Later cases have emphasized that the interest the plaintiff alleges must not be one which is held in common by all members of the public. Plaintiff must be suffering or threatened with a concrete, particularized injury. *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

The original version of Section 17 contained a general prohibition of all forms of gambling in the State. It is fair to assume that it was based on some generalized belief that gambling was a corrupting, dangerous influence in society from which the people of the State should be protected.[20]

Over the years, the constitutional provision has been amended in stages. Each amendment was designed to exempt from the general prohibition some particular form of gambling. Undoubtedly the amendments reflect a changing perception about the evils of gambling. Nevertheless, Section 17 continues to reflect a concern about the potentially deleterious influence of gambling on society.

A police power regulation of this kind is for the benefit of the society at large. As a component of that society, the NFL is within the zone of interests to be protected. In addition, the NFL has alleged a concrete injury in fact to itself. The NFL charges that the likelihood that games will be fixed or, more likely, that the public will imagine that the games have been fixed to produce a large payoff will hurt its reputation. In addition, it asserts that the same ill will toward gambling that prompted the legislature to enact the constitutional provisions will drive away those NFL fans who believe that the NFL has consented to or approved gambling on its

games. This is a sufficient stake in the outcome to ensure that the matter has been presented in a true adversary context. Finally, the State does not contend that review has been precluded. Accordingly, the NFL has standing to make its constitutional claim.

The standing analysis with respect to NFL's contention that Scoreboard violates the lottery statute, 29 Del.C. § 4801, *et seq.,* is much the same. The lottery statute embodies the same underlying mistrust for gambling qualified by the idea that State control will obviate the undesirable aspects of gambling while providing the State with a source of income. The zone of interests protected is the same and the same allegations of injury are sufficient.

### B. Validity Of Scoreboard Under The Delaware Constitution

The 1974 Amendment to Article II, Section 17 of the Delaware Constitution authorizes lotteries under State control. It does not define the term "lottery". The NFL contends that the word lottery has a well established meaning in the law and that the Scoreboard games do not fall within that meaning because they entail an element of skill.

It is unquestioned that there are three elements necessary to a lottery: prize, consideration and chance.[21] However, there is a split of authority as to whether a game that incorporates an element of skill as well can qualify as a lottery. Two approaches to the question have developed:

Under the English rule, a lottery consists in the distribution of money or other property by chance, and nothing but chance, that is, by doing that which is equivalent to drawing lots. If merit or skill play any part in determining the distribution, there is no lottery. . . . In the United States, however, by what

---

**20.** *Commonwealth v. Lund,* 142 Pa.Super. 208, 222, 15 A.2d 839, 845 (1940), described the rationale behind the Pennsylvania anti-lottery statute in the following terms:

Our own statute begins by declaring all lotteries, public or private, to be common nuisances. It is the general, and public effect

of the system which brings it under condemnation. This is because of the tendency of such systems and practices to inflame the gambling instinct, and to corrupt public morals.

**21.** *Affiliated Enterprises v. Waller,* 1 Terry 28, 40 Del. 28, 5 A.2d 257, 259 (Del.Super.1939).

appears to be the weight of authority at the present day, it is not necessary that this element of chance be pure chance, but it may be accompanied by an element of calculation or even of certainty; it is sufficient if chance is the dominant or controlling factor. However, the rule that chance must be the dominant factor is to be taken in the qualitative or causative sense. [Footnotes omitted]

3 *Wharton's Criminal Law and Procedure* § 935 (Anderson ed. 1957).

The Delaware courts have not ruled on whether the "pure chance" or "dominant factor" rule applies in this State. Compare *State v. Sedgwick*, 2 Boyce's 453, 25 Del. 453, 81 A. 472, 473 (1911). The courts of two adjoining states considered this problem in the context of privately operated football pools and they concluded that the pools did fall within the meaning of lottery despite the presence of an element of skill. *State v. Steever*, 103 N.J.Super. 149, 246 A.2d 743 (1968). *Commonwealth v. Laniewski*, 173 Pa.Super. 245, 98 A.2d 215 (1953). In addition, over the last ten years the trend toward acceptance of the dominant factor rule described in *Wharton* has continued and expanded. *See, e. g., Morrow v. State*, 511 P.2d 127, 129 (Alaska 1973); *Finster v. Keller*, 18 Cal.App.3d 836, 96 Cal. Rptr. 241 (1971). Absent clear language in the Constitution supporting a contrary rule, I believe the Delaware Supreme Court would be inclined to adopt the majority, dominant factor rule.

Further support for the dominant factor rule can be found in the legislature's interpretation of the word lottery. The Delaware Constitution may be amended by a two-thirds vote of the General Assembly in two successive sessions with an intervening election. Del.Const., Art. XVI, § 1. The Amendment to Section 17 authorizing state lotteries was voted on favorably by the 126th General Assembly in 1972 and by the 127th General Assembly in 1973. The same Legislature that gave final approval to the constitutional amendment in its second session in 1974 established the State Lottery and State Lottery Office. 29 Del.C. § 4801, *et seq.* In doing so, it construed the term lottery broadly:

> "Lottery" or "state lottery" or "system" shall mean the public gaming systems or games established and operated pursuant to this chapter and including all types of lotteries.

29 Del.C. § 4803(b). The Scoreboard games fall well within the accepted definitions of those terms. "Games" or "gaming" embrace a far wider range of activities than those based on pure chance.[22] Moreover, the legislature contemplated that some lottery games would be related to or based on sporting events. 29 Del.C. § 4805(b)(4).[23]

This broad legislative definition is significant because the Delaware courts subscribe to the rule of construction that when terms of the Constitution are ambiguous, the interpretation of the legislature is entitled to deference. In *State v. Hart*, 3 W.W.Harr. 15, 33 Del. 15, 129 A. 691 (Del.Super.1925), the court commented:

> If it was not clear from the Constitution when a vacancy shall be filled by some exercise of skill, or by the transpiring of some event unknown until it occurs, something of value is, as the conclusion of premises agreed, to be transferred from a loser to a winner.

**22.** Black's Law Dictionary 808 (4th ed. 1968) defines games as "a sport, pastime or contest. [Citations omitted]. A contrivance which has for its object to furnish sport, recreation or amusement". The same source defines gaming as follows:

> An agreement between two or more persons to play together at a game of chance for a stake or wager which is to become the property of the winner, and to which all contribute. [Citations omitted].

> "Gaming" and "gambling", in statutes are similar in meaning and either one comprehends the idea that, by a bet, by chance, by

**23.** *See also* DX 7, a report prepared by Analytics, Inc., for the Delaware Lottery Study Committee. The study, which was distributed to the members of the General Assembly before they voted on the lottery bill, proposed a football lottery much like the one that has been adopted.

election it would be not only proper but necessary to consider any law that would remove the uncertainty, but a statute may not be considered in construing a constitutional provision which is so clear and complete that there is no room for construction. Construction implies a precedent obscurity in the instrument on which it is brought to bear. Black on Interpretation of Laws, §§ 1 and 2.

Given the near contemporaneous approval of the lottery amendment and the lottery statute, application of this rule of construction is particularly appropriate in this instance.

█ In sum then, I conclude that the legislative interpretation of the term lottery together with the weight of authority in other jurisdictions would persuade the Delaware Supreme Court that "lottery" should be interpreted to encompass not only games of pure chance but also games in which chance is the dominant determining factor. The question that remains is whether chance is the dominant factor in some or all of the Scoreboard games. Both the evidence and the case law suggest that it is.

The operation of Football Bonus, Touchdown and Touchdown II are described above.[24] The winners of each are determined by the outcome of the NFL games. Plaintiffs acknowledge that the results of NFL games are a function of myriad factors such as the weather, the health and mood of the players and the condition of the playing field. Some educated predictions can be made about each of these but each is also subject to last minute changes and to an element of the unknowable, or to put it another way, to an element of chance.

In Scoreboard, the unknowable factors in each game are multiplied by the number of games on which the Scoreboard player bets.

None of the games permits head-to-head or single game betting. Thus, the element of chance that enters each game is multiplied by a minimum of three and a maximum of fourteen games. In addition, in Touchdown II, the designated point spread or "line" is designed to equalize the odds on the two teams involved. This injects a further factor of chance.

The evidence tends to show that for the first nine weeks of the 1976 season chance was the dominant factor in the outcome of both the NFL games and the Delaware Football Lottery. "Jimmy the Greek" is a widely recognized oddsmaker, syndicated columnist and television personality who earns his living in part by predicting the outcome of NFL games.[25] The record shows that, although he correctly predicted the winner of 101 out of 126 NFL games from September 12 through November 8, if he had bet on both pools of games in Football Bonus each week, he would have won only three times. He would never have won the All-Game Bonus awarded to those who correctly choose the winners of all fourteen games in a single week. We cannot determine how he would have fared in Touchdown because we do not know which three, four or five games he would have placed wagers on each week. However, he successfully predicted the point spread in only 38 out of 126 games in nine weeks. This strongly suggests that expertise would not have carried the day in this game either.

█ We do not know anything about football expertise of those who actually played Scoreboard. Nonetheless, over the first nine weeks, the average percentage of winners in each pool of Football Bonus and among the three-game Touchdown bettors hovered around 5%.[26] Among those who bet on five games, the average percentage of winners was .22%. These results lend further support to the contention that

---

**24.** *Supra*, at 1376.

**25.** DX 31. *See also* Doc. No. 102A.

**26.** DX 27B.

chance rather than skill is the dominant factor in the games.

Other courts have likewise concluded that football betting pools and other similar betting schemes based on sporting events qualify as games of chance. In *Commonwealth v. Laniewski*, 173 Pa.Super. 245, *supra*, 98 A.2d at 217, responding to a claim that football pools are not games of chance, the court said:

> Past records, statistics and other data might be consulted and, by reasoning from them, a forecast might be made as to the outcome of any particular game or games. However, there are many unpredictable elements which can and do enter into the eventual outcome. These elements—including the fact that at least twenty-two men are concerned in playing the game—constitute the chance which makes this particular pool a lottery. No one knows what may happen once the game has begun.

*Accord State v. Steever*, 103 N.J.Super. 149, 246 A.2d 743 (App.Div.1968).

The plaintiffs make an alternate argument that the Scoreboard games do not fall within the definition of lottery based on the history of Section 17. They point to earlier versions of the constitutional provision which distinguished between lotteries and pool selling and prohibited both. They contend that this establishes that, under Delaware law, there is a distinction between the two types of gambling activity that survives the 1974 amendment and that pool selling continues to be a prohibited activity under the general interdiction of "all forms of gambling". I do not believe any clear inference as to legislative intent can be drawn from the failure to mention pool selling in the revised Section 17. However, if I were inclined to draw one, I find defendants' explanation, that the General Assembly intended to drop the distinction between lotteries and pool selling and to leave open the possibility that the State Lottery Office might adopt a pool selling type game as part of the State Lottery the more plausible one.

## C. Validity Of Scoreboard Under 29 Del.C. § 4801, et seq.

### 1. Duty to Affiliate

Plaintiffs assert next that, even if sports betting pools are permitted by the Delaware Constitution, the Lottery Director has violated the command of 29 Del.C. § 4805(b)(4) to enter into a contract of affiliation with the NFL before commencing a betting scheme based on its games. The NFL reads the relevant provision more narrowly than I believe is warranted. The statute provides:

> (b) The Director shall also have the power and it shall be his duty to:
>
> \*     \*     \*     \*     \*     \*
>
> (4) Enter into contracts for the operation of any game or part thereof and into contracts for the promotion of the game or games. This authorization is to be construed to include, but not be limited to, contracting with any racing or other sporting association to conduct sporting events within any racetrack or sports field in the State the outcome of which shall determine the winners of a state game or, as an alternative, to affiliate the determination of the winners of a game with any racing or sporting event held within or without the State.

The NFL argues that this section requires the Lottery Director to obtain the contractual consent of any sporting association before basing a lottery game on its games. To arrive at this construction, it emphasizes the significance of the phrase "it shall be his duty . . . " but ignores the context in which it appears. Subsection (b) of Section 4805 is the general enabling provision of the lottery statute enumerating in twelve separate subparagraphs a wide range of "powers and duties" of the Director designed to give him the authority required to conduct a lottery that "shall produce the maximum amount of net revenues consonant with the dignity of the

State and the general welfare of the people". 29 Del.C. § 4805(a).

Fairly read, the statute gives the Director the power and the duty to engage in each of the specified activities *as necessary* to achieve the goals of the statute. Thus, under subparagraph (4), the Director is *authorized* to base lottery games on sport events or races and to enter into contracts to affiliate lottery games with sporting associations when that is necessary.

■ If one were to accept plaintiffs' interpretation of subparagraph (4) and be consistent, the provision would have to be read to impose an unqualified duty to base lottery games on sports events as well as to enter into contracts with the sporting associations conducting those events. I do not think plaintiffs would argue that the statute *requires* lottery games based on sports events. Rather, as the statute plainly reads, it is an "authorization", not a command.

One final comment is appropriate. If plaintiffs had the kind of property interest they argued for, then this section could be read to require a contract with the NFL. However, I have concluded that Delaware is not misappropriating any protectible property interest and, thus, no contract is necessary.

## 2. *Revenue Apportionment*

The lottery act requires that not less than 30% of the total revenues accruing from the sale of lottery tickets be paid into the General Fund of the State and that not less than 45% be distributed as prize money. Not more than 20% of the gross ticket sales may be devoted to administrative expenses. 29 Del.C. §§ 4805(a)(11) and 4815. As earlier noted, Touchdown II is a fixed payoff game unlike the other Scoreboard games in which prizes are determined on a pari-mutuel basis. The plaintiffs complain that this fixed payoff scheme violates the statutory mandate that not less than 45% of revenues be paid out in prizes and not less than 30% be paid into the State. I agree.

In Touchdown II, there is a prize scale ranging from $10 for four out of four correct selections to $1,200 for twelve out of twelve correct selections.[27] In a given week, if those who play Touchdown II are extraordinarily successful, pay outs may run far over the 45% mark. Similarly, if the players fare very poorly, it is conceivable that there would be no prizes awarded at all. As an example of the former, during the week of December 5, 1976, bets totalling $95,929 were placed on Touchdown II. After an initial announcement that the game would be cancelled, the Lottery Office reinstated the bets and winning tickets totalled $67,330 or 70% of the amount wagered in the game that week.[28]

On its face, the fixed payoff scheme does not comply with the revenue apportionment provisions of the statute. The Lottery Director contends that the probabilities are such that, over time, the payouts in Touchdown II would average 45% of revenues. In addition, he says that the 45% requirement refers to the total prize money awarded in all of the lottery games over an extended period, not on a game-by-game or week-by-week basis.

■ I have serious doubts that the statute authorizes the Lottery Office to average prize awards over several different games to maintain the 45% pay out level. As far as this Court is aware, the practice of the Office has been to adhere to the 45% standard game-by-game, week-by-week.[29] Moreover, 29 Del.C. § 4815 requires that accumulated funds be turned over to the

---

27. These are the returns on a $1 wager and they are multiplied by the amount a player wagers.

28. Doc. No. 92.

29. T. C–195. If Football Bonus and Touchdown are true pari-mutuel games as the State asserts, the prizes must be determined game-by-game.

General Fund monthly. This severely restricts the ability to average prizes over time. But I need not resolve this issue of statutory interpretation because the State has not presented convincing evidence that the devices they propose to achieve the 45% prize structure would accomplish that purpose. The only evidence on this point is Simmons' declaration that, "[t]he probabilities we have studied indicate that on the average we would pay out what we are supposed to pay out, 45% or more".[30] That testimony is not sufficient to rebut what the fixed payoff structure suggests, that the game was established and operated without regard to the 45% prize money requirement. It must be invalidated.

## V. THE FEDERAL ANTI–GAMBLING LAW CLAIMS

Plaintiffs maintain that defendants are operating the Delaware Lottery in a manner which violates a number of sections of the federal anti-gambling laws, e. g., 18 U.S.C. §§ 1301, 1302, 1304 and 1084. I assume, without deciding, that this is true. Nevertheless, the relief sought cannot be granted on this ground.

A. *Plaintiffs Have No Civil Claim Based Directly Upon The Federal Anti-Gambling Statutes*

■ The Supreme Court recently observed in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), that "the reasoning of . . . [the cases which have implied a private cause of action where none has been expressly provided by Congress] is that, where congressional purposes are likely to be undermined absent private enforcement, private remedies may be implied in favor of the particular class intended to be protected by the statute". 430 U.S. at 25, 97 S.Ct. at 941. The opinion in *Piper* also reaffirmed the court's position in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) that

four factors are " 'relevant' in determining whether a private remedy is implicit in a statute not expressly providing one". 37 U.S. at 430, 97 S.Ct. at 947. They are: (1) whether plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or deny one; (3) whether it is consistent under the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff; and (4) whether the cause of action is one traditionally relegated to state law.

The anti-gambling laws upon which plaintiffs rely restrict the utilization of interstate commerce in aid of gambling enterprise. They were enacted at the turn of the century "to protect the [private] citizen from the demoralizing [and] corrupting influence" of solicitations to gamble. *United States v. Horner*, 44 F. 677 (S.D.N.Y.1891), aff'd, 143 U.S. 207, 12 S.Ct. 407, 36 L.Ed. 126 (1892). I believe the suggestion that they were enacted for the "especial" benefit of sports entrepreneurs to be simply far fetched.

It is true that Congress in 1974 enacted 18 U.S.C. § 1307 for the purpose of exempting state sponsored lotteries from certain of the prohibitions of Sections 1301–1304 and defined "lottery" for this purpose as not including "the placing or accepting of bets or wagers on sporting events or contests". While this clearly exhibits an intent to exclude state sponsored sports betting from the exclusion, it does not alter the basic purpose of the statute or those who comprise its direct beneficiaries. Moreover, Section 1307 cannot be read to justify implication of a private right of action in favor of sports entrepreneurs without inferring a congressional intent to create a cause of action against state governments and the Supreme Court has cautioned that such an intent should not be inferred absent clear evidence in the legislative history. *Employees of the Department of Public Health and*

*Welfare of Missouri v. Department of Public Health and Welfare of Missouri*, 411 U.S. 279, 285, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973).

■ No legislative history has been cited to the Court which indicates any congressional intent to create a private cause of action of any kind, much less a private cause of action by a commercial enterprise against a State. Nor is there any indication that private enforcement is necessary to effectuate the restrictions on interstate commerce which Congress sought to impose. For these reasons, I hold that plaintiffs have no private cause of action under the federal anti-gambling statutes.

B. *Plaintiffs Have No Unfair Competition Claim Under Which Defendants' Duty Is Measured By The Federal Anti-Gambling Statutes*

Plaintiffs have cited a number of cases which hold that a commercial enterprise has an unfair competition claim against a competitor who achieves a competitive advantage by conducting his business in an illegal manner. In *Featherstone v. Independent Service Stations Association*, 10 S.W.2d 124 (Tex.Civ.App.1928), for example, the owner of a filling station was granted injunctive relief against a chain of competing stations which was promoting its own services and products by means of a lottery illegal under state law.

I do not question the reasoning of these cases. An entrepreneur who is willing to obey the law should not be put at a disadvantage by a competitor who is less scrupulous. This reasoning cannot be stretched to cover a situation like the one before this Court, however, without emasculating the settled principles discussed above which circumscribe judicial creation of private causes of action.

■ Moreover, the only potential injury to the NFL which this Court is able to perceive arises not from the aspects of de-

fendants' activities which are alleged to violate the federal gambling statutes, but rather from those aspects of the Delaware Lottery which have produced confusion as to sponsorship. Stated another way, if such confusion is eliminated, this record does not support the view that the existence of the Delaware Lottery, whether legal in all respects or not, will cause injury to the NFL plaintiffs.

## VI.  THE CIVIL RIGHTS ACT CLAIM

■ Plaintiffs maintain that the defendants, acting under color of state law, have taken their property without due process of law. I have previously concluded that the common law of unfair competition and Section 43(a) of the Lanham Act entitled plaintiffs to protection against confusion as to source or affiliation and it is, therefore, unnecessary to consider whether they might be entitled to the same relief under 42 U.S.C. § 1983. I have also held that, with this exception, defendants have not deprived plaintiffs of any legally recognized property interest. Further relief under the Civil Rights Act would, accordingly, be inappropriate.

## DEFENSES AND COUNTERCLAIMS

By way of affirmative defense, the defendants assert that the NFL is barred from obtaining any injunctive relief from this Court under the doctrines of acquiescence and unclean hands. I conclude that the defendants have established neither defense.

■ Acquiescence consists of conduct on the part of a trademark holder that amounts to "an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant". *McCarthy* § 31:14. There was no acquiescence here. From the time the NFL learned that Delaware was considering a football lottery, it vigorously voiced its opposition and its belief that such a

lottery was incompatible with the NFL's trademark rights.[31]

The course of conduct of which the defendants complain is more consistent with an abandonment defense and it may be that that is the defense they intended to assert. *McCarthy* § 31:14, explains the distinction:

> While plaintiff's failure to prosecute trademark uses by parties *other than defendants* may be evidence of plaintiff's acquiescence in defendant's use, such a failure is not acquiescence where the third party's usage is de minimus. Acquiescence should not be confused with abandonment of trademark rights. The defense of abandonment results in a loss of rights as against the world, while the defense of acquiescence merely results in a loss of rights as against one defendant. [Emphasis in original]

The defendant points to the NFL's failure to bring suit against other gambling related uses of NFL team names such as in the Nevada and Montana betting schemes, in tout sheets which publish predicted point spreads and in newspaper circulation contests.

It would appear that most of the examples the defendants cite are small scale and, in some cases, short lived uses of NFL registered marks. The NFL could reasonably have concluded that there was no risk that the public would be misled into believing that the NFL was involved in any way. And, as *McCarthy* notes, not every *de minimus* use must be pursued.

■ Football gambling in Nevada would appear to be the only large scale use of NFL names to which the defendants can

point in support of their abandonment theory. Numerous representatives of the NFL testified that they considered the situation in Nevada unique and did not believe it posed the same kind of threat to their enterprise. Regardless of the validity of that judgment, an intent to abandon cannot be inferred from the mere failing to bring suit in Nevada. *See McCarthy* § 17:5. This is particularly true when one considers the number of instances in which the NFL has brought suit or taken other measures to protect its trademark rights in non-gambling contexts.[32]

■ Defendants' unclean hands defense is based on what it characterizes as NFL's trademark misuse in its licensing program. Relying on a blank licensing agreement form for proof of its allegations,[33] the defendants complain that the NFL is guilty of using its trademark in violation of the antitrust laws. In particular, defendants claim that all licenses are exclusive, that they are available only in a package deal for the marks of all twenty-eight clubs, that minimum royalty payments are required to pay royalties at a single fixed rate. I need not consider whether these practices alone or together would constitute antitrust violations. The blank form defendants proffer is simply insufficient proof of how the NFL trademark licensing program operates.

■ In addition to relying on these alleged antitrust violations as the basis of an unclean hands defense, the defendants raise the antitrust claims affirmatively as a counterclaim for treble damages.[34] The failure of proof is quite obviously just as fatal to the counterclaim. Moreover, defendants

**31.** T. A–210.

**32.** T. C–49–51.

**33.** PX 78.

**34.** In their counterclaim, defendants contend that the plaintiffs' prosecution of this lawsuit

and their public statements about the Delaware Lottery while the suit was pending constitute additional unlawful anti-competitive behavior. This claim fails for a lack of showing of injury but I note also that the NFL's actions do not approach a course of conduct which could be characterized as predatory.

have not shown that they were injured by the allegedly anti-competitive practices.[35]

## CONCLUSION

For all of the reasons discussed in the foregoing Opinion, the Court will enter an Order (1) enjoining the defendants to in-clude in publicly disseminated Scoreboard materials a clear and conspicuous statement that Scoreboard is not associated with or authorized by the National Football League and (2) declaring Touchdown II in violation of 29 Del.C. §§ 4805(a)(11) and 4815. All other requests for relief are denied.

Submit order.

35. For defensive purposes it is not necessary for the defendants to show injury to them-selves. Injury to the public is sufficient. *See McCarthy* § 31:16B and cases cited therein.